**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KEITH JAMERSON,
*Petitioner-Appellee*,

v.

DAVID L. RUNNELS, Warden,
*Respondent-Appellant*.

No. 12-56064

D.C. No.
2:02-cv-09890-
JHN-AJW

OPINION

Appeal from the United States District Court
for the Central District of California
Jacqueline H. Nguyen, District Judge, Presiding

Argued and Submitted
November 7, 2012—Pasadena, California

Filed April 24, 2013

Before: Dorothy W. Nelson and Diarmuid F. O'Scannlain,
Circuit Judges, and James K. Singleton, District Judge.*

Opinion by Judge O'Scannlain

---

* The Honorable James K. Singleton, Senior United States District Judge
for the District of Alaska, sitting by designation.

## SUMMARY**

### Habeas Corpus

The panel reversed the district court's grant of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction of receiving stolen property based on *Batson v. Kentucky*, 476 U.S. 79 (1986).

The panel first held that it was not precluded from considering the driver's license photographs that showed the race of each venire member, to the extent that the photographs merely reconstructed facts visible to the state trial court that ruled on petitioner's *Batson* challenge.

In evaluating the *Batson* claim, the panel first performed the comparative analysis that the state court declined to pursue (because state law precluded such review for the first time on appeal). The panel then reevaluated the ultimate state decision in light of the comparative analysis and any other evidence tending to show purposeful discrimination, to decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications to be genuine. The panel concluded that, although some of the prosecutor's justifications appeared thin at first glance, a more searching review revealed nothing in the record suggesting that the state court unreasonably found these reasons to be genuine and not pretextual.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

David A. Wildman, Deputy Attorney General, Los Angeles, CA, argued the cause and filed a brief for the respondent-appellant.  With him on the brief were Kamala D. Harris, Attorney General of California; Dane R. Gillette, Chief Assistant Attorney General; Lance E. Winters, Senior Assistant Attorney General; and Jason Tran, Deputy Attorney General, Los Angeles, CA.

Brianna J. Fuller, Deputy Federal Public Defender, Los Angeles, CA, argued the cause and filed a brief for the petitioner-appellee.  With her on the brief was Sean K. Kennedy, Federal Public Defender, Los Angeles, CA.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the California courts' determination that a prosecutor had genuine, race-neutral reasons for striking four black jurors during voir dire was an unreasonable application of federal constitutional law.

**I**

On June 15, 1999, California Highway Patrol Officers Joseph Phillips and John Beay found Petitioner Keith Jamerson sitting in the driver's seat of a Chevrolet truck stopped on a highway exit ramp in Manchester, California. Jamerson claimed to own the truck and requested that the officers help him move it off the exit ramp.  Noticing that the passenger window on the truck was broken and that broken

glass was scattered on the passenger seat and floorboard, the officers ran the license plate of the truck before attempting to move it. They discovered that the vehicle was registered to Phillip Allen—not Jamerson. Further investigation revealed that Jamerson did not have a key to the vehicle and that the ignition had been turned without a key. Jamerson's walking cane was found on the passenger seat atop the broken glass.

Jamerson was charged in California state court with one count of unlawful driving or taking of a vehicle and one count of receiving stolen property. He was convicted of receiving stolen property, but the jury could not reach a verdict on the unlawful driving or taking of a vehicle charge, and thus that count was dismissed.

During jury selection for his trial, Jamerson twice raised an objection under *Batson v. Kentucky*, 476 U.S. 79 (1986), and its California analog, *People v. Wheeler*, 583 P.2d 748 (Cal. 1978), to the prosecutor's use of peremptory strikes against black jurors. He raised the first after the prosecutor had exercised eight of her peremptory challenges—two against Hispanic jurors and six against black jurors. The trial court determined that Jamerson had made "a prima facie showing" of an improper motive and required the prosecutor to explain her reasons for striking the black jurors. After the prosecutor provided her justifications for striking each juror, the trial judge found that the prosecutor had offered "valid, independent reasons which is [sic] a proper basis to excuse a juror." He denied Jamerson's *Batson*/*Wheeler* motion.

Voir dire continued, and the prosecutor exercised her next two peremptory challenges on black jurors. Jamerson renewed his *Batson*/*Wheeler* motion. Although the judge believed that he had observed grounds warranting the two

strikes, he again required the prosecutor to "justify them." The prosecutor provided her reasons for striking both jurors, and the trial judge concluded "that the prosecutor in good faith [wa]s giving reasons" for her peremptory strikes. He denied the second motion.

Although the prosecutor exercised five additional peremptory strikes after Jamerson's second *Batson*/*Wheeler* motion—three against white jurors and two against black jurors—Jamerson did not renew his *Batson*/*Wheeler* motion a third time. The final jury panel included one Asian juror, two black jurors, five Hispanic jurors, and four white jurors. A black juror and a white juror were seated as alternates.

On direct appeal, Jamerson argued that the trial court erred in denying his *Batson*/*Wheeler* motions. Listing the reasons that the prosecutor proffered for striking each black juror and ultimately deferring to the trial court's independent assessment of the prosecutor's credibility in giving those justifications, the California Court of Appeal affirmed. It declined to conduct a comparative juror analysis because, at the time, California law prohibited a court from performing a comparative analysis for the first time on appeal. *See People v. Johnson*, 71 P.3d 270, 285 (Cal. 2003), *rev'd*, 545 U.S. 162 (2005). The California Supreme Court denied review.

Jamerson then filed a petition for habeas corpus in the federal district court. The case was initially referred to a magistrate judge, who conducted a comparative juror analysis. In his report and recommendation analyzing Jamerson's *Batson/Wheeler* claim, the magistrate judge concluded that comparative analysis undermined the prosecutor's rationale for striking four of the prospective

black jurors. He urged the district court to grant habeas relief.

In the interim, the Supreme Court issued its decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). Citing *Pinholster*, the State filed an objection to the magistrate judge's initial report and recommendation because the magistrate judge had considered driver's license photographs submitted by Jamerson, which showed the race of each venire member. The State argued that, after *Pinholster*, the consideration of such evidence was prohibited. The magistrate judge ordered additional briefing and issued a supplemental report and recommendation. The report concluded that *Pinholster* did not bar consideration of the photographs because they were not new evidence but were instead demonstrative exhibits designed to reconstruct facts visible to the state trial court.

The district court adopted the report and recommendation of the magistrate judge in full and granted habeas relief. The State of California, through Jamerson's prison warden, timely filed a notice of appeal.

## II

The State asserts that the district court erred in granting Jamerson's habeas petition, which alleged that the California courts improperly denied his *Batson*/*Wheeler* motions. In short, the State argues that the California courts were reasonable in determining that the prosecutor did not engage in purposeful discrimination, even in light of the comparative juror analysis this court is required to conduct. Any discussion of the State's argument, therefore, must begin with an outline of the applicable *Batson* framework.

*Batson* challenges involve a three-step inquiry. *Rice v. Collins*, 546 U.S. 333, 338 (2006). First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge based upon race. *Id.* If this showing is made, the burden then shifts to the prosecutor to offer a race-neutral explanation for the strike. *Id.* Finally, the court evaluates "the persuasiveness of the justification proffered by the prosecutor" to decide whether the defendant has shown purposeful discrimination. *Id.* (internal quotation marks omitted). Ultimately, the defendant has the burden of persuading the court that the strike was racially motivated. *Id.* (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)).

The State and Jamerson disagree about the reasonableness of the state court's analysis at *Batson*'s third step, where the trial court is acting as a "trier of fact," determining whether the prosecutor's race-neutral justification for the challenge is sufficiently convincing. *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006) (en banc). "In deciding if the defendant has carried his burden of persuasion [at *Batson*'s third step], a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (internal quotation marks omitted). The "totality of the relevant facts" includes the "prosecutor's statements about his jury selection strategies and his explanations . . . for striking minority jurors" as well as "the characteristics of people he did not challenge." *Kesser*, 465 F.3d at 360.

As part of its evaluation of the prosecutor's reasoning, the court must conduct a comparative juror analysis—that is, it must "compar[e] African American panelists who were struck with those non-African American panelists who were allowed

to serve." *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012). Where the prosecutor's reason for striking a black juror applies "just as well" to a non-black juror who is selected for the panel, "that is evidence tending to prove purposeful discrimination" that should be considered in assessing the genuineness of the prosecutor's proffered explanations. *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 241 (2005).

When evaluating the persuasiveness of the prosecutor's justifications at *Batson*'s third step, the trial judge is making a credibility determination. Although the prosecutor's reasons for the strike must relate to the case to be tried, the court need not believe that "the stated reason represents a sound strategic judgment" to find the prosecutor's rationale persuasive; rather, it need be convinced only that the justification "should be believed." *Kesser*, 465 F.3d at 359 (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991)). Because "it is widely acknowledged that the trial judge is in the best position to evaluate the credibility of the prosecutor's proffered justifications," due deference must be accorded to the trial judge's determination. *Briggs*, 682 F.3d at 1171. Indeed, even if "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility, . . . on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice*, 546 U.S. at 341–42.

### III

Because the Antiterrorism and Effective Death Penalty Act (AEDPA) at 28 U.S.C. § 2254 governs our evaluation of the California court's decision, we start our analysis by sketching the contours of its application to this case—a task

that proves somewhat complex given the substantive law governing habeas petitions alleging *Batson* violations.

We do not begin at the drawing board anew; some lines have already been etched by our prior precedent. A state court's finding that the prosecutor did not engage in purposeful discrimination is reviewed under the deferential standard set forth in 28 U.S.C. § 2254(d)(2).[1] *See Briggs*, 682 F.3d at 1170; *Cook v. LaMarque*, 593 F.3d 810, 816 (9th Cir. 2010); *Ali v. Hickman*, 584 F.3d 1174, 1180–81 (9th Cir. 2009). Thus, the state court's decision will be upheld unless it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Indeed, in evaluating habeas petitions premised on a *Batson* violation, "our standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that a trial court's

---

[1] Jamerson argues that the California Court of Appeal decision should be evaluated under 28 U.S.C. § 2254(d)(1) and that this court should review his claim de novo because the state courts unreasonably applied clearly established federal law when they declined to conduct a comparative juror analysis. This court has already addressed and rejected that argument. *See, e.g.*, *Cook v. LaMarque*, 593 F.3d 810, 816 & n.2 (9th Cir. 2010) ("[E]ven if the trial court and the California Court of Appeal did not engage in comparative juror analysis, where the relevant evidence is found in answers to juror questionnaires and a transcript of voir dire . . . [s]ection 2254(d)(2) . . . applies." (second alteration in original)). Although the magistrate judge believed that an intra-circuit split existed on this question, he was mistaken. *Compare id.* at 815–16 & n.2, *and Ali*, 584 F.3d at 1180–81 (affording deference under § 2254(d)(2) where the state courts reached *Batson*'s third step but erred in evaluating purposeful discrimination), *with Johnson v. Finn*, 665 F.3d 1063, 1068–69 (9th Cir. 2011) (evaluating purposeful discrimination de novo where the California court applied the wrong legal standard at *Batson*'s first step and thus never reached the factual question of purposeful discrimination at *Batson*'s third step).

credibility determination was supported by substantial evidence, we must uphold it." *Briggs*, 682 F.3d at 1170 (citing *Rice*, 546 U.S. at 338–42). This is because the question of discriminatory intent "largely will turn on evaluation of credibility" and "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Hernandez*, 500 U.S. at 365 (internal quotation marks and citations omitted).

This seemingly straightforward standard becomes convoluted, though, when it is paired with the requirement that we conduct, in the first instance, the comparative analysis that the state court declined to perform. *Green v. LaMarque*, 532 F.3d 1028, 1031 (9th Cir. 2008) (holding that where a state court has failed to conduct a comparative juror analysis "[w]e must conduct that analysis *de novo*, rather than remanding for the state courts to do so").[2] It is clear in these cases that AEDPA deference still applies, and the state court decision cannot be upset unless it was based upon an "unreasonable determination of the facts." *See Cook*, 593 F.3d at 816 & n.2; *Green*, 532 F.3d at 1031. In this class of cases, therefore, we must reconcile our duty to apply AEDPA deference to the state court's factual determinations with the need to review the facts from a perspective not considered by the state courts.

---

[2] Although prior opinions refer to conducting a comparative analysis of the stricken and selected jurors "de novo," this choice of phrase is not meant to denote the applicable standard of review. *See Green*, 532 F.3d at 1031. Instead, it indicates that we should conduct the comparative analysis in the first instance, rather than remanding the case to the state courts to do so. *See id.* To avoid confusion, we will use the phrase "in the first instance" when referencing our duty to conduct a comparative analysis that the state court failed to perform.

Combining these two requirements, we conclude that our evaluation of the state court's disposition of Jamerson's *Batson* claim should proceed in two steps. To begin, we must perform in the first instance the comparative analysis that the state court declined to pursue. Then, we must reevaluate the ultimate state decision in light of this comparative analysis and any other evidence tending to show purposeful discrimination to decide whether the state was unreasonable in finding the prosecutor's race-neutral justifications to be genuine. In essence, we must assess how any circumstantial evidence of purposeful discrimination uncovered during comparative analysis alters the evidentiary balance and whether, considering the totality of the evidence, the state court's credibility determination withstands our doubly deferential review.

## IV

Applying this framework, we turn to the substance of the State's arguments regarding the district court's evaluation of Jamerson's *Batson* claim.

## A

As a threshold matter, we must decide whether *Pinholster* precludes us from considering the enlarged driver's license photographs that Jamerson submitted to show the race of each venire member, as the State contends. The State vigorously opposes consideration of these photographs. It reasons that *Pinholster* must bar our examination of them because the California Court of Appeal "was limited to analyzing the transcripts of voir dire, which did not reveal the racial makeup of the entire jury venire." Because one of the state courts did not know the race of each jury venire member and

because that state court was the one to issue the last reasoned opinion, the State argues that we, too, should operate under this same handicap.

We are not persuaded that *Pinholster* bars consideration of evidence designed to reconstruct the racial composition of the jury venire. Where a habeas petitioner alleges a *Batson* violation, courts are required to conduct "side-by-side comparisons of [the] black venire panelists who were struck and white panelists allowed to serve" to evaluate the merits of the claim. *Miller-El II*, 545 U.S. at 241. If the state court has not performed this comparative juror analysis, we must do so in the first instance. *Green*, 532 F.3d at 1031. Without knowing the race of each venire member—a fact visible to the state trial court but obscured by the cold record on review—it would be impossible to discharge this duty. Reconciling these two lines of precedent, therefore, we conclude that *Pinholster* does not bar our consideration of evidence reconstructing the racial composition of a petitioner's jury venire.

A common sense reading of *Pinholster* leads us to this conclusion. There, the Supreme Court was concerned with preventing "habeas-by-sandbagging" and with promoting comity between state and federal courts by ensuring that the state's consideration of a petitioner's claims were the "main event" rather than a "tryout on the road" to federal court. *See Pinholster*, 131 S. Ct. at 1398–1401 (internal citations omitted). The Court thus barred consideration of evidence adduced for the first time in a hearing in federal district court and limited review to the "record before the state court." *Id.* at 1398. When examining a petitioner's habeas claim through the AEDPA lens, we "focus[] on what a state court knew and did," as the Court emphasized, and thus consider "how the

[state court] decision confronts [the] set of facts that were before [it]" rather than how it should have confronted a new set of facts presented for the first time in federal court. *Id.* at 1399 (third alteration in original) (internal quotation marks omitted). It cautioned against faulting a state court for "unreasonably appl[ying] federal law to evidence it did not even know existed." *Id.* at 1399 n.3.

*Pinholster*'s concerns are not implicated here. The driver's license photographs depicting the racial composition of Jamerson's jury venire do not constitute new evidence of which the state courts were completely unaware when deciding his *Batson*/*Wheeler* claims. Instead, these photographs reconstruct physical attributes that were visible to the state court that originally ruled on Jamerson's *Batson*/*Wheeler* motions. They represent a part of the set of facts that the state court evaluated when concluding that the prosecutor had genuine, race-neutral reasons for striking each juror.[3]

The State attempts to obscure the common sense of the matter by stressing the fact that the state appellate court, which issued the last reasoned opinion in this case, did not know the race of every venire member. But nothing in *Pinholster* inherently limits this court's review to evidence that the state appellate court—as opposed to the state trial

---

[3] If Jamerson were offering the DMV records to establish a juror's date of birth or address or to prove some other fact not obviously visible to the state court, this would, of course, present a different case. As we understand his argument, however, he offers the driver's license photographs only to establish the racial composition of his venire. Because this fact was visible to the state court judge who initially ruled on Jamerson's *Batson*/*Wheeler* motion, *Pinholster* does not bar our consideration of the evidence.

court—considered. *See id.* at 1398–99. To the contrary, *Pinholster* itself precluded review only of evidence that was never revealed in *any* state court proceeding. *Id.* at 1399 ("It would be contrary to [AEDPA's] purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*.").

Finally, we recognize that, if we were to conclude otherwise, we would have to read *Pinholster*'s evidentiary holding as implicitly overruling the substantive *Batson* requirements set forth in *Miller-El II*. For if *Pinholster* bars consideration of the photographs, examination of the state court's disposition of Jamerson's *Batson* claim—and, in particular, our ability to perform a comparative analysis—will be virtually impossible. We do not believe that the Supreme Court had this consequence in mind when it decided *Pinholster*. Therefore, we hold that *Pinholster* allows us to consider photographs that show the racial composition of a jury venire to the extent that those photographs merely reconstruct facts visible to the state trial court that ruled on the petitioner's *Batson* challenge.

## B

With that threshold matter resolved, we turn to the heart of the State's contentions regarding Jamerson's *Batson* claim.

Although Jamerson's two *Batson* challenges in the state court proceedings encompassed eight black jurors,[4] before this court the State and he disagree about whether the prosecutor lacked genuine, race-neutral reasons for striking only four of these jurors—Juror #4856, Juror #0970, Juror #0619, and Juror #3117D.[5] After conducting a comparative analysis, the magistrate judge concluded that the state court unreasonably failed to find pretext in the prosecutor's proffered explanations for striking these jurors. The State argues that this finding was in error because comparative analysis of each of the four stricken jurors does not reveal evidence of discriminatory intent sufficient to render the state court's decision unreasonable.

## 1

Juror #4856, a black male, was an unemployed former custodian with no prior jury experience. At the beginning of voir dire, when the judge asked if anyone had "extraordinary circumstances that they believe[d] would prevent them from serving as a juror," he explained to the court that he had suffered from "hepatitis" for about a year. He feared that serving on a jury might make him miss his monthly shots, although he "guess[ed]" that a proposed accommodation would suffice to alleviate his concern if he was selected. The

---

[4] The prosecutor ultimately struck two other black jurors, but these jurors were not the subject of a *Batson* challenge and therefore are not considered in our analysis. *Cf. Dias v. Sky Chefs, Inc.*, 948 F.2d 532, 534 (9th Cir. 1991) (refusing to consider a *Batson* claim where the party failed to raise an objection before the venire was dismissed).

[5] In any event, we also agree with the magistrate judge that the prosecutor's reasons for excluding the other four jurors were credible and "borne out by the record."

prosecutor exercised her eighth peremptory challenge to dismiss him. When asked to explain the reason for her challenge, the prosecutor stated:

> He said he had hepatitis, he is unemployed, and has no jury experience. I felt he would be too sympathetic to the defendant because the defendant had some kind of leg impairment and was walking with a cane or had a cane in the car and was walking.

The trial judge found that the prosecutor had offered a "valid, independent reason[] which is a proper basis to excuse a juror." Concluding that the trial court judge had "apparently independently assessed the prosecutor's reasons for peremptorily challenging the jurors," the appellate court deferred to his credibility assessment and affirmed.

The parties appear to dispute the nature of the prosecutor's reason for exercising this peremptory challenge. Jamerson argues, and the magistrate judge found, that the prosecutor relied only on the juror's physical ailment and the potential that it might cause him to sympathize with the defendant in justifying her strike. The State seems to assert that the prosecutor also relied on his reluctance to serve. We conclude that Jamerson's interpretation is a better reading of the prosecutor's statement in response to the *Batson* motion and confine our analysis to deciding whether this stated reason can withstand comparative scrutiny. *See Miller-El II*, 545 U.S. at 252.

Comparing Juror #4856 to the non-black jurors allowed to serve, we find no other juror who shared the characteristic that the prosecutor identified as problematic—that is, no other juror suffered from a physical ailment he or she considered an "extraordinary circumstance[]." Comparative analysis therefore supports the justification proffered, as no seated juror possessed the trait that the prosecutor identified as the reason for the strike. *Cook*, 593 F.3d at 818. More importantly, comparative analysis adds nothing new to the factual equation that the state court already assessed and decided. Because the state trial judge was better situated to determine the genuineness and credibility of the prosecutor's reasoning, and comparative analysis does not alter the evidentiary balance, we must take care to "defer to [his] credibility and factual findings." *Briggs*, 682 F.3d at 1171.

Although finding no circumstantial evidence of discriminatory intent through comparative analysis, the magistrate judge nonetheless held that the state court unreasonably concluded that the prosecutor's stated reason for exercising this strike was genuine. He identified two bases for this conclusion, neither of which persuade us to find the state court's ruling unreasonable under our doubly deferential standard of review.

First, the magistrate judge concluded that excluding the juror on the basis of his physical ailment was "nonsensical" because "[p]hysical ailments simply were not relevant to this case, and the record is devoid of anything suggesting that suffering from hepatitis would make [the juror] inherently sympathetic toward petitioner." The magistrate judge was correct in believing that the prosecutor's stated reasons for striking a juror must be "relevant to the case." *See Green*, 532 F.3d at 1030. But when determining whether the reason

given in this instance was genuine, he applied the wrong standard for relevance. Relevance, in the context of exercising peremptory strikes, requires only that the prosecutor express a believable and articulable connection between the race-neutral characteristic identified and the desirability of a prospective juror. *See Rice*, 546 U.S. at 341 ("It is not unreasonable to believe the prosecutor remained worried that a young person with few ties to the community might be less willing than an older, more permanent resident to impose a lengthy sentence for possessing a small amount of a controlled substance."); *see also Cook*, 593 F.3d at 817–18 (holding that the prosecutor's justification for striking a juror was "not clearly pretextual" because "it is plausible that daily contact with lawyers would shape a person's perception of a trial"). Concern that a juror might have reason to sympathize or identify with the defendant, regardless of whether the identifying feature relates to the merits of the case, is "relevant" under *Batson*. *See, e.g.*, *Rice*, 546 U.S. at 341 (upholding age, single status, and lack of ties to the community as valid bases to exclude a juror in a drug case because they might make the juror more sympathetic to the defendant); *Williams v. Rhoades*, 354 F.3d 1101, 1109–10 (9th Cir. 2004) (fear that a juror might identify with the defendant because both had young sons was a valid, race-neutral reason to exercise a peremptory strike); *see also United States v. Brown*, 560 F.3d 754, 763 (8th Cir. 2009) (upholding the strike of a prospective juror from a murder trial because both the juror and the defendant received public assistance and the juror might identify with the defendant on that basis). Thus, in this case, the prosecutor's fear that Juror #4856 might identify with Jamerson because both suffered from a physical ailment qualifies as relevant in the sense *Batson* contemplates.

The magistrate judge's related concern about "the record [being] devoid of anything suggesting that suffering from hepatitis would make [the juror] inherently sympathetic toward petitioner," failed to take into account the proper burden of proof and to afford appropriate deference to the state courts. The prosecutor need not establish with evidence on the record that her voir dire instincts are objectively correct; instead, the defendant must show that the prosecutor's reasons are not subjectively genuine. *Rice*, 546 U.S. at 338 (citing *Purkett*, 514 U.S. at 768); *Kesser*, 465 F.3d at 359 (quoting *Hernandez*, 500 U.S. at 365). Though hepatitis and a leg disability are not identical—or even closely related—medical conditions, both are permanent physical ailments that impact a person's everyday life in a significant way. The state appellate court was not unreasonable to believe that the prosecutor genuinely saw these permanent conditions as a shared experience between the defendant and the juror, which might give rise to empathy and bias, especially when viewed through our doubly deferential lens.

Second, the magistrate judge believed that "[t]he fact that the prosecutor did not ask [the juror] any questions about his illness confirms that her reason was pretextual." An examination of the record belies this conclusion. Throughout the entire voir dire process, the court—and not the attorneys—conducted the questioning of the jurors. The prosecutor's failure to question a juror cannot be held against her when attorney questioning did not occur during voir dire.[6]

---

[6] The magistrate judge proffered this same reason as one basis for rejecting the prosecutor's justifications for striking Juror #0970, Juror #0619, and Juror #3117D, as well. We conclude that he was incorrect in considering this as evidence of discriminatory intent in each instance.

*See Miller-El II*, 545 U.S. at 243–44 (finding that a prosecutor's failure to question a juror further was evidence of a discriminatory motive *where the prosecutor was personally questioning the jurors at length* during voir dire).

In sum, even though the prosecutor's reason for excusing the juror may not have been compelling and "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility," there is not sufficient evidence to "supersede the trial court's credibility determination" under our doubly deferential standard of review. *Rice*, 546 U.S. at 341–42. Thus, we conclude that the state was not unreasonable in finding that the prosecutor's justification for challenging Juror #4856 was genuine.

**2**

Juror #0970, a black female, was a married social services employee with two adult daughters. In the 1980s, her brother was convicted of arson and possession of drugs. He served time for those offenses. Although she had not attended any of the proceedings, she believed that her brother was treated "fairly." She also indicated that she "had a brother [who] was killed in San Bernardino in 1989." No one was arrested or charged with the crime. In response to a question about whether the investigation was handled adequately, she stated, "Adequately. They never found any witnesses, and I am not sure exactly what occurred." The prosecutor exercised her second peremptory challenge to dismiss this juror. When asked to explain the reason for her challenge, the prosecutor stated:

> She also has brothers serving time in prison and another brother killed in 1991. No charge because nobody was found. For my witnesses, I felt she may have some reservation about the police and how they were actively or not actively looking because this case deals with somewhat locating witnesses. I would have reservations about her.

As with Juror #4856, the trial court found the prosecutor's stated reasons "valid" and "independent." Based in large part on the credibility finding of the trial court, the court of appeal affirmed.

The prosecutor proffered two reasons for striking Juror #0970: (1) she had a brother who served time in prison for arson and drug crimes, and (2) her other brother was the victim of an unsolved murder. Comparing this juror to other jurors who shared these same characteristics, the State argues that comparative analysis does not undermine the rationale that the prosecutor proffered, contrary to the conclusion of the magistrate judge.

The State first argues that comparative analysis does not undercut the prosecutor's reliance on the conviction of this juror's brother. Jamerson identifies three non-black jurors who were allowed to remain on the panel and who also knew someone that was associated with a crime—Juror #2918, Juror #6375, and Juror #4241. He asserts that, in light of the prosecutor's failure to strike these jurors, comparative analysis does undermine the prosecutor's first stated justification. Upon close review, however, it appears that Jamerson cast his comparative net too broadly. The

purported parallels between these jurors and Juror #0970 provide, at best, weak evidence of a discriminatory motive, insufficient to render the state court's conclusions unreasonable.

At the outset, we note that Juror #4241 cannot properly be classified as similarly situated to Juror #0970 because the prosecutor was unaware of his sister's conviction. After a new group of jurors—including Juror #4241—answered a set of form questions, the prosecutor requested a sidebar. The following dialogue then took place:

> [Prosecutor]: I think I missed some information on juror [#4241]. Did he say his sister was arrested?
>
> Court: Say what?
>
> [Prosecutor]: Did he say his sister was arrested?
>
> [Defense]: No. He said his house was burglarized and he went to court to testify.
>
> [Prosecutor]: Oh, okay. So he never said anything about drug possession? I don't know where I picked that up.
>
> Court: Number [4241]? No.
>
> [Prosecutor]: Okay.

Because the prosecutor was assured that Juror #4241's sister had not been arrested for a crime, he was not similarly

situated to Juror #0970 from the prosecutor's perspective. Failure to strike him, therefore, cannot be considered evidence of a discriminatory purpose. *Cf. Miller El II*, 545 U.S. at 242–45 (discrediting the prosecutor's proffered explanation where written responses of white jurors allowed to serve were the same as written responses of a black juror who was struck). Indeed, in calling a sidebar to clarify Juror #4241's response about his sister's conviction, the prosecutor actually *increased* the credibility of her justification for striking Juror #0970, as she showed a special interest in the prior conviction of a non-black juror's close relative. *Cf. id.* at 244 (holding that a prosecutor "would have cleared up any misunderstanding by asking further questions" if he truly considered a race-neutral characteristic grounds for a peremptory strike).

Turning to Jurors #2918 and #6375, a complete side-by-side comparison shows that the parallels between these jurors and Juror #0970 are relatively weak and offer little evidence of a discriminatory motive. The prosecutor consistently struck both black and non-black jurors who, like Juror #0970, had close relatives who committed serious crimes and were incarcerated for them. Before striking Juror #0970, the prosecutor struck Juror #6309, a non-black woman whose son was serving time in prison for kidnaping and robbery. Later, the prosecutor also struck Juror #6207, a non-black woman whose husband was incarcerated and about to be tried for felony evading. These non-black jurors' situations are more analogous to the situation of Juror #0970 than Juror #6375's, whose "daughter ha[d] a friend who is incarcerated," and Juror #2918's, whose brother was merely arrested for a possible DUI six or seven years prior.

By exercising peremptory strikes against non-black jurors who had close relatives incarcerated, therefore, the prosecutor evidenced a sincere concern for the same problematic trait she identified in Juror #0970; her failure to exercise peremptory strikes against other non-black jurors who shared weak parallels with this juror, although prompting us to scrutinize her actions more carefully, ultimately does little to undermine the stated justification. *See Cook*, 593 F.3d at 817. It certainly does not convince us that the state court was unreasonable in crediting the prosecutor's rationale under our doubly deferential standard of review.

Moving to the prosecutor's second stated reason for striking this juror—that her other brother's murder was never solved—the State argues that the California courts were reasonable in crediting this rationale. Jamerson counters by again identifying three non-black jurors who were allowed to serve despite purportedly sharing the same background: Juror #2918, Juror #6375, and Juror #3136. Again, however, a full comparative analysis reveals little to undercut the state court's conclusion that the prosecutor was applying genuine, race-neutral standards. During voir dire, the prosecutor repeatedly challenged jurors of all races who had an experience with an unsolved violent crime, but retained jurors who were the victims of lesser crimes. This pattern is first evident in the prosecutor's disparate treatment of Juror #0970 and Juror #6824, both black prospective jurors. While the prosecutor struck Juror #0970, whose brother's murder had not been solved, the prosecutor accepted Juror #6824, who was the victim of an unsolved home burglary. The prosecutor's treatment of non-black jurors followed the same trend. The prosecutor struck Juror #3605, a white juror whose friend was shot during an unsolved robbery in Compton, and Juror #2333, a white juror who was the victim

of an unsolved robbery at gunpoint. But the prosecutor accepted Juror #3136, who had $200 stolen in New Orleans, and Juror #2918, who was the victim of a car theft and home burglary.

Even more telling, unlike any of the other jurors, Juror #0970 specifically volunteered that the local police "never found any witnesses" to her brother's murder—raising the exact concern of the prosecutor in rooting out victims of unsolved crimes. Although the prosecutor's failure to strike Juror #3136 arouses some suspicion about her reasoning, as Juror #3136 expressed a stronger feeling that law enforcement was "pretty lax" when investigating his theft, the relevant similarities between these jurors, and thus the evidence of a discriminatory motive, are faint as Juror #3136 emphasized that the New Orleans police department conducted the investigation into his theft and that locally "it would be handled differently."

In short, even though jurors need not be "exactly identical" to infer pretext from a comparative pattern of strikes, *Miller-El II*, 545 U.S. at 247 n.6, the evidence in this instance of weak parallels between Juror #0970 and other jurors who remained on the panel does not convince us that the state court was unreasonable in finding the prosecutor's justifications believable. Consequently, under our doubly deferential standard of review, Jamerson's challenge to Juror #0970 does not warrant habeas relief.[7] *See Rice*, 546 U.S. at

---

[7] The magistrate judge's finding of discriminatory intent rested on two other grounds, neither of which is sufficient to raise an inference of discriminatory motive. For the sake of completeness, however, we explain our rejection of his reasoning.

First, the magistrate judge faulted the prosecutor for "incorrectly stat[ing] that [Juror #0970] has 'brothers' serving time in prison, when she actually had said that 'a brother' had been in prison."

According to the Supreme Court in *Miller-El II*, the mischaracterization of a potential juror's testimony weighs against a prosecutor's credibility. *Miller-El II*, 545 U.S. at 243–44. But as the Supreme Court clarified in *Rice*, "seizing on what can plausibly be viewed as an innocent transposition makes little headway toward the conclusion that the prosecutor's explanation was clearly not credible." *Rice*, 546 U.S. at 340.

In these two cases, the Supreme Court has thus drawn a fine distinction between a prosecutor's false statement that creates a new basis for a strike that otherwise would not exist and a prosecutor's inaccurate statement that does nothing to change the basis for the strike. *Compare Miller-El II*, 545 U.S. at 243–44 (claiming that a juror indicated he would not vote for the death penalty when the juror clearly specified that he would vote for it), *with Rice*, 546 U.S. at 340 (miscounting the number of jurors who were dismissed based on their youth but correctly reporting that the challenged juror was youthful). In this case, the prosecutor's mistaken belief that Juror #0970 had "brothers serving time" rather than a brother who served time falls on the *Rice* side of the line. Whether or not the juror had one brother or two brothers incarcerated, the same justification for the strike remained—the juror might have an unfavorable view of the system based upon a family member's involvement in it. Thus, the prosecutor's misspeak offers no proof of discriminatory intent. *See Rice*, 546 U.S. at 340.

Second, the magistrate judge found that "[t]he prosecutor's professed concern about [Juror #0970]'s brother's murder is belied by the fact that she did not ask her a single question about it . . . ."

This finding is wrong for two reasons. For one, as noted above, neither the prosecutor nor the defense questioned any of the jurors during voir dire, and the prosecutor cannot be faulted for the voir dire practices of the trial court in this case. Additionally, as previously discussed, the prosecutor specifically requested a sidebar and clarification when she believed that she had missed information about a non-black juror's

341–42.

**3**

Juror #0619, a black female, was a married critical care nurse. She had a brother who was serving time on a narcotics charge and probation violation at the time of trial. She had not attended any court proceedings and had "no opinion" on whether her brother was treated fairly. She was also herself the victim of a "serious hit and run accident." Although a suspect was arrested and charged with the crime, "they were sent back to Mexico" rather than tried and imprisoned. Thus, in response to a question about whether the local police performed adequately in her case, she stated "I—you know, I wouldn't think so because the person was sent back, and that was it . . . . [a]nd then I was told at the time . . . [when] I was in a very critical state, that they were probably back [in the United States]." She thus concluded that "it wasn't handled properly," someone in local law enforcement was "lax," and "someone just dropped the ball." The prosecutor exercised her third peremptory strike to excuse this juror. When asked to explain the reason for her challenge, the prosecutor stated:

> That is based on the fact that she had brothers doing time for drugs, and she was a victim of a hit and run. And she expressed some reservation that somehow—how did she say it?—that the police handled it adequately, but

relative's prior experience in the criminal system, thus supporting the claim that this information was important to her voir dire decision-making. Therefore, this finding also fails to support an inference of a discriminatory motive.

that [the] person was gone to Mexico, and she was somehow notified later. But I got the impression that she wasn't too happy with the result.

The trial judge held that this was a "valid, independent reason[] which is a proper basis to excuse a juror." Reviewing this finding on appeal, the California court upheld the trial judge's determination that the prosecutor's justification was genuine.

As with Juror #0970, the prosecutor identified two reasons for striking Juror #0619: (1) she had a brother[8] who was incarcerated for narcotics offenses, and (2) she was the victim of a hit-and-run accident that she believed local law enforcement had not properly handled. Because the prosecutor identified the same basic problematic characteristics in striking Juror #0619 as she did in striking Juror #0970, the comparative analysis for these two jurors is virtually identical and, like with Juror #0970, this analysis fails to undercut the genuineness of the justifications proffered for striking her.

To avoid unnecessary repetition, therefore, we note that, as explained at length above, the prosecutor systematically excluded jurors, like Juror #0619, who had a close relative in prison for a crime and who had a prior experience with a violent personal crime that remained unresolved, regardless

---

[8] Although the magistrate judge again made much of the prosecutor's mistaken statement that this juror had "brothers" rather than a brother in prison, this mistaken statement did not create a basis for a strike that otherwise would not exist and thus falls into the category of harmless misspeaks, as discussed above. *See Rice*, 546 U.S. at 340.

of the juror's race.   In fact, Juror #0619 in many ways presented a stronger case for a strike than the similarly situated non-black jurors discussed above because she was personally the victim of a "serious" crime, was "in [a] very critical state" for "a long period of time," and expressly stated that she felt her investigation "wasn't handled properly" by local law enforcement.

In light of this, the state court was not unreasonable in concluding that the prosecutor did not have a discriminatory motive when she challenged Juror #0619.  *See id.*

**4**

Juror #3117D[9] was a married black female who lived in Los Angeles and worked for the U.S. postal service.   The prosecutor exercised her tenth peremptory strike to remove her from the panel.   When asked to give the reason for her strike, the prosecutor explained:

> She was a postal worker.   I had a terrible personal experience with a postal worker on the jury.   And I think that was the basis. . . . I just have terrible experiences with postal workers.

The trial judge concluded: "The prosecutor in good faith is giving reasons.   Whereas, a person being a postal worker in itself would not necessarily exclude someone, I think based upon the entire considerations, including facial expression[s]

---

[9] Because two jurors received the juror designation #3117, we have appended the first letter of their last names to their juror numbers to differentiate between them.

and other things that I observed, I think it is proper." Reciting these same facts, the California Court of Appeal found that the trial court "ma[d]e a sincere and reasoned effort to evaluate the credibility of the prosecutor's nondiscriminatory justifications" and upheld its ruling.

Like with Juror #4856, the parties disagree about the proper characterization of the reasons proffered for excusing Juror #3117D. Jamerson argues that this court may only consider the postal worker justification without reference to the trial court's demeanor observations. The State, by contrast, contends that the prosecutor's justification and the trial court's demeanor observations are inherently intertwined.

Although both readings are potentially a reasonable interpretation of the voir dire transcript, we are required to give deference to the state court's decision on habeas review. In that vein, we conclude that the trial judge's demeanor observations—including the facial expressions of the prosecutor as she gave her justification and the interactions between the prosecutor and the juror—were inherently intertwined with the justification proffered; they affirmed that the prosecutor had good cause to suspect that she would have a "terrible personal experience" with Juror #3117D like she had suffered with other postal workers in the past. Thus, we consider whether the prosecutor's justification, in light of the trial court's demeanor observations, withstands comparative analysis as the State contends it does.

Because the trial judge here found that the prosecutor's reasons were made in "good faith" based upon "the entire considerations, including facial expression[s] and other things that I observed," we must take special care to afford this

demeanor and credibility finding double deference. *Briggs*, 682 F.3d at 1170; *see also Hernandez*, 500 U.S. at 365. This finding cannot be overturned unless a comparative analysis shows that "the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence . . . ." *Briggs*, 682 F.3d at 1170.

Of course, comparative analysis may raise some doubt about the sincerity of the prosecutor's reasons for striking this juror because the prosecutor did accept Juror #3117B who was also a postal worker. But upon closer review, this comparative analysis does little to undercut the credibility of the prosecutor's earlier assertion that she preferred not to have postal workers on the jury for at least two reasons. First, Juror #3117B was black, like Juror #3117D, and thus the comparison does not uncover any circumstantial evidence of a discriminatory motive. *See Cook*, 593 F.3d at 818 ("Juror 2 is also African American and therefore provides a weak basis for comparison." (citing *Miller-El II*, 545 U.S. at 241)). And second, the prosecutor accepted Juror #3117B, who was the last member of the venire, with reluctance only after calling a sidebar and learning that the court could not "get[] any more jurors today." Therefore, comparative analysis alone does not show that the state appellate court was unreasonable in concluding that the trial court's credibility finding was supported by substantial evidence.

The magistrate judge rejected Juror #3117D's occupation as a genuine, race-neutral reason for excluding her from the jury because her job had no "evident relation" to Jamerson's case. In doing so, the magistrate judge again applied the wrong relevance standard. *See Rice*, 546 U.S. at 341. A prosecutor may strike a potential juror on the basis of his or

her occupation if the prosecutor can state a genuine, race-neutral reason for believing that the occupation would make the juror unfavorable. *Cook*, 593 F.3d at 818 (upholding the strike of a juror who worked at a law firm because it is "plausible that daily contact with lawyers would shape a person's perception of a trial"); *id.* at 821 (finding the strike of a homemaker valid because "the prosecutor's conviction that homemakers have insufficient social skills to be good jurors" seemed "sincere"). Here, the prosecutor stated that she previously had a "terrible personal experience" with a postal worker on a jury and, based on his demeanor observations, the trial judge found her credible; under our doubly deferential standard of review, we find no reason to question this conclusion.

Although we do not believe that the prosecutor's stated reason for excusing Juror #3117D was overwhelmingly persuasive, we also are not convinced that the state court was unreasonable in crediting her explanation as genuine, particularly affording the double deference due to the state trial court's ruling. *See Rice*, 546 U.S. at 338.

**5**

The State asserts that cumulative evidence similarly does not support a finding that the California courts unreasonably rejected Jamerson's *Batson* challenges. Therefore, in addition to determining whether the prosecutor acted with a discriminatory motive in striking the four individual jurors discussed above, we also must evaluate whether cumulative evidence supports Jamerson's *Batson* claim.

Although the sheer number of prosecutorial challenges to black jurors in this case "unquestionably calls for a searching

inquiry," it does not automatically warrant the conclusion that the prosecutor was engaged in purposeful discrimination. *See Cook*, 593 F.3d at 825–26 (concluding that the evidence cumulatively did not support a finding of purposeful discrimination even though the prosecution struck seven black jurors); *see also Williams*, 354 F.3d at 1107–08 (noting that racial discrimination "is easy to find even in its absence.").

The prosecutor excused ten of the twelve black venire members during the course of voir dire even though only twelve of the forty-three prospective jurors were black. But looking beyond these numbers to the traits and attributes of each individual juror, we find that the state was not unreasonable in concluding that the prosecutor's race-neutral reasons for her strikes provided a better explanation of her conduct than race. *See Cook*, 593 F.3d at 825–26 (finding no cumulative evidence of discriminatory motive where the prosecutor was consistent in applying the asserted race-neutral justifications).

For example, the prosecutor struck three black jurors and two non-black jurors who had a close relative incarcerated for a serious crime. She struck two black jurors and one non-black juror who had been incarcerated themselves. She struck three black jurors and two non-black jurors who had been victims of violent crimes that law enforcement had not fully or properly resolved. And she struck any venire member who was previously on a hung jury. Moreover, the prosecutor never attempted to strike Juror #6824, a black member of the venire who was seated on the panel throughout voir dire. If her motives were discriminatory, she had plenty of opportunities to remove this juror. Nonetheless, she never struck Juror #6824, presumably because Juror #6824

presented none of the characteristics that the prosecutor identified as warranting the exercise of a peremptory strike.

Finally, the fact that the form set of questions asked of each juror was targeted at the characteristics the prosecutor consistently identified as important further bolsters her credibility. *Cf. Cook*, 593 F.3d at 825 (finding no cumulative evidence of discrimination where the prosecutor was "consistent in his questioning of prospective jurors").

Thus, our cumulative review of the prosecutor's conduct does not persuade us that the state court was unreasonable in upholding her race-neutral justifications for the strikes.

**V**

Overall, the evidence presented, including comparative analysis, does not persuade us that habeas relief is warranted under our doubly deferential standard of review. Although some of the prosecutor's justifications appear thin at first glance, a more searching review reveals nothing in the record suggesting that the state court unreasonably found these reasons to be genuine and not pretextual. *See Briggs*, 682 F.3d at 1170 ("[W]e must defer to the California court's conclusion that there was no discrimination unless that conclusion 'was based on an unreasonable determination of the facts . . . .'"). Thus, even though "[r]easonable minds reviewing the record might disagree about the prosecutor's credibility," the evidence presented does not "suffice to supersede the trial court's credibility determination." *Rice*, 546 U.S. at 341–42. Jamerson's habeas petition should have been denied.

The decision of the district court granting habeas relief is accordingly **REVERSED**.