**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROBERT WAYNE MURRAY,
*Petitioner-Appellant*,

v.

DORA SCHRIRO, Warden,
*Respondent-Appellee*.

No. 08-99008

D.C. No.
2:99-CV-01812-DGC

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
September 13, 2012—Las Vegas, Nevada

Filed March 17, 2014

Before: Johnnie B. Rawlinson, Jay S. Bybee,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Bybee

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for murder.

The panel first held that the state court's denial of petitioner's claim—that the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79 (1986), by using peremptory challenges to strike two Hispanic potential jurors—was not based on an unreasonable determination of the facts.

The panel next held that the state court's denial of petitioner's claim of ineffective assistance of counsel regarding the investigation and presentation of mitigation evidence of petitioner's troubled childhood and impairments was not based on an unreasonable determination of the facts or an unreasonable application of clearly established federal law.

The panel finally, the panel declined to grant a motion to expand the certificate of appealability because the district court properly found that allowing petitioner to bring numerous proposed claims in an amended habeas petition would be futile.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jennifer Y. Garcia (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; and Jaleh Najafi, Assistant Federal Public Defender, Phoenix, Arizona, for Petitioner-Appellant.

Jeffrey A. Zick (argued), Assistant Attorney General; Terry Goddard, Attorney General; and Kent Cattani, Chief Counsel, Arizona Attorney General's Office, Phoenix, Arizona, for Respondents-Appellees.

**OPINION**

BYBEE, Circuit Judge:

Robert Wayne Murray ("Murray") was convicted in Arizona of two counts of first-degree murder and sentenced to death. The Arizona Supreme Court affirmed his conviction, and the United States Supreme Court denied Murray's petition for certiorari. Arizona courts denied Murray's request for post-conviction relief. In this habeas suit brought under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214, we address three issues: (1) whether the Arizona state court's denial of Murray's *Batson* motion was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts," 28 U.S.C. § 2254(d); (2) whether the state court's denial of Murray's ineffective assistance of counsel claim was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts," *id.*; and

(3) whether Murray "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), when the district court denied his "Motion for Leave to File a Second Amended Motion for Writ of Habeas Corpus," and if so, whether the district court abused its discretion in denying the motion.  The district court for the District of Arizona denied Murray's petition for writ of habeas corpus.

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, and we affirm.

## I.    FACTS AND PROCEDURAL HISTORY

A. *Facts*

### 1.  Background

Murray's responsibility for the murders is not questioned. On May 14, 1991, LaVern Raduenz stopped at Grasshopper Junction, located near Kingman, Arizona, for coffee. Raduenz was an acquaintance of Dean Morrison and Jacqueline Appelhans, who lived at Grasshopper Junction and ran the store/restaurant situated there.  Approaching the restaurant, Raduenz noticed that there was money lying on the ground outside, the restaurant door was open, and the cash register was displaced from its usual position.  Raduenz then walked over to Morrison's house and discovered that the door to the house was also open, revealing Morrison's and Appelhans's bodies, clad in bathrobes, lying face down in the living room.  Morrison had been shot twice with a .38 caliber pistol, in the neck and temple, and his skull had been shattered by a shotgun blast at close range.  Appelhans had been shot at least twice in the back of the neck with a .22

caliber weapon and two .38 caliber slugs were removed from her skull.

Morrison's house had been ransacked. Drawers were open, items littered about, and a cushion cover was missing from the couch. In the store, the cash-register drawer had been removed and a roll of coins and loose change were strewn about the kitchen floor and throughout the courtyard. Although all of the facts pointed to robbery as the underlying motivation, $172 was found lying on a desk chair and Morrison's wallet, containing $800, was undisturbed in his pants' pocket. In the store, packs of Marlboro cigarettes were left in paper bags and the gasoline register was on. Outside on the store's patio were Morrison's glasses, a flashlight, and a set of keys. Law enforcement officers also discovered guns, bullets, and shell casings at the crime scene.

A Mohave County Sheriff's Department detective analyzed the tracks—footprints—at the crime scene. Besides those created by Raduenz and law enforcement officers, the detective identified four sets of tracks. Two sets of tracks were attributed to the victims, while the other two were determined to have been made by a pair of tennis shoes and a pair of western-style boots. Photographs of the tracks were taken, and some sketches made. Moreover, the detective determined that the tracks indicated that Morrison had resisted his attacker. Near some of the tracks attributed to Morrison and his assailant, law enforcement officers also found tire tracks attributed to a Grasshopper Junction tow truck, owned by Morrison, that was nowhere to be found at the crime scene.

Elsewhere, on the same morning, an Arizona Department of Public Safety officer happened upon a white 1988 Ford

Tempo sedan bearing Alabama license plates. The officer's suspicions were aroused by the vehicle's behavior, leading the officer to run an inquiry on the vehicle's license plate number. The officer learned that the vehicle and its two occupants, Murray and his brother Roger Wayne Murray, were wanted in Alabama, suspected of having been involved in an assault and robbery and potentially armed and dangerous. As the officer attempted to pull over the vehicle, a high-speed chase ensued. The vehicle eventually left the highway, running a manned and armed roadblock, and only stopping when it left the road and came to an impassable wash.

The driver, Murray, threw from the vehicle a .38 caliber revolver containing four live bullets. A subsequent search of Murray's person yielded two spent shotgun shells and keys that were later determined to fit a 1991 Chevrolet pickup located on Morrison's property. His passenger, Roger Wayne Murray, threw a loaded .25 caliber semi-automatic pistol from the vehicle. The shell casings found at the crime scene and the casings recovered from Murray's pocket were determined to have been fired by the guns found in the Murray brothers' possession. The men were wearing tennis shoes and boots consistent with the tracks identified at Grasshopper Junction.

A subsequent vehicle inventory uncovered: a loaded twelve-gauge shotgun and live shells; a checkered couch cushion, matching the pattern of the couch in Morrison's house, and containing rolled coins stamped "Dean Enterprises, Grasshopper Junction, Kingman, Arizona, 86401"; a blue pillowcase containing approximately $1400 in rolled coins and $3300 in cash; gloves; a receipt from the Holiday House Motel in Kingman, Arizona, dated May 12,

1991 (the Murray brothers had listed a 1988 Ford on the hotel registration card and had checked out on May 13, 1991); and a road atlas with the locations of two rural shops circled, including Grasshopper Junction. A scanner and connecting knob, fitting the empty bracket of the Grasshopper Junction tow truck that had left the tire tracks found at the crime scene—which was later discovered abandoned on westbound I-40—were also found in the vehicle.

Human blood and tissue was found on the Murray brothers' clothing, as well as on the cushion cover recovered from their vehicle. Blood tests indicated that the blood on Roger Wayne Murray's pants could have come from the victims or Murray; the blood on Murray's shirt could have come from the victims, but not from Roger Wayne Murray; and the blood on the cushion could have come from Appelhans, but not Morrison or either of the Murray brothers.

2. Jury Selection and Trial

The Murrays were arrested and indicted in Mohave County, Arizona, for the first-degree murders of Morrison and Appelhans, and the armed robbery of Morrison. During jury selection, after the trial court excused potential jurors for cause, only two Hispanic venire members remained: potential jurors Pethers and Alvardo. The prosecutor then used peremptory challenges to dismiss the two remaining Hispanic potential jurors. Murray's trial counsel objected to the prosecutor's use of the peremptory challenges and requested that the trial court conduct an inquiry under *Batson v. Kentucky*, 476 U.S. 79 (1986).

In light of the objection, the trial judge asked the prosecutor to respond. Regarding potential juror Pethers, the following colloquy ensued:

> PROSECUTOR: Your Honor, first, as to Ms. Pethers, I don't believe that she is a Hispanic. I don't recall seeing that on her jury questionnaire, and I don't recall if she appeared to talk Hispanic to me. So, I am not sure that that's a showing—
>
> THE COURT: I don't have the questionnaire in front of me.
>
> DEFENSE: The questionnaire did indicate that she's Hispanic, Your Honor. I believe her maiden name was Garcia, but her first name is Christina.
>
> THE COURT: I remember she said her mother's name was Garcia.
>
> PROSECUTOR: Right. I am not sure that's Hispanic, Garcia, as opposed to Spanish, the amount I know about her mother from the prosecutor. I could be wrong, I don't know.
>
> THE COURT: Well, of course, I can look at the questionnaires. I will have to take a recess to do that. But, let's assume for the time being that she is Hispanic and the defense is correct.

PROSECUTOR: Your Honor, the State recently did a major drug investigation of her mother and her mother's brother . . . . It's a very big case. Both of those defendants went to jail for a time. I'm not sure of the status of Mrs. Garcia. From what Mrs. Pethers said, the charge was dismissed. I believe there's been some sort of negotiated deal, but I am not positive about that. But, I know both those people were heavy into drugs. Both of the people around them were suspected of being in drugs. There's a forfeiture action proceeding against Garcia, Mallon. This being the daughter, I do not believe that she—I don't want her on the jury for those reasons, possible bias.

Regarding potential juror Alvardo, the prosecutor stated:

PROSECUTOR: Mr. Alvardo is Hispanic, and it was a close call on that strike. What I went on is, as Mr. Alvardo told the Court, he knows me, I know him. Not well. I'm going basically on my personal knowledge of Mr. Alvardo five or six years ago. I was dating a lady who was a nurse, going to various social functions, parties, whatnot. I met Mr. Alvardo probably a half a dozen times anyway, and I had discussions with him. The social functions at these parties, my recollection of Mr. Alvardo is he's a very, very nice person. He is too nice. You couldn't get him to disagree with you. He didn't want to hurt anybody. He is just

> indecisive, is my recollection of him. My strike on him is solely going back to my personal knowledge of meeting him numerous times four or six years ago.

The trial court denied Murray's *Batson* objections. The trial judge stated that based on his "own opinions about those particular jurors[,] . . . the reasons given by the State are sufficient . . . [and] consistent with my own assessments of those particular jurors." Subsequently, a jury was empaneled and the joint trial of the Murray brothers began.

At the conclusion of their joint jury trial, Murray and his brother were both found guilty of the first-degree murders of Morrison and Appelhans, and the armed robbery of Morrison.

3.   Sentencing

Prior to Murray's sentencing hearing, the Mohave County Probation Department conducted a pre-sentence investigation. As part of that investigation, Murray was interviewed to prepare a social history. In that interview, Murray spoke of a childhood marred by an abusive father and his own general failure in all activities during his youth. Murray discussed his educational (both traditional and vocational) and employment background. Murray detailed his medical problems, including "dizzy spells and headaches," and the substance abuse that he began to engage in during his teenage years. Accompanying the pre-sentence investigation report was a record of Murray's prior criminal offenses.

In addition to the information contained in the pre-sentence investigation report, Murray's trial counsel, O'Neill, prepared a Pre-Sentence Memorandum ("Memorandum") for

the trial judge to consider at Murray's aggravation/mitigation hearing. The Memorandum included attachments containing Murray's prison records; interviews providing information regarding his employment history, including the interview of a former co-worker; and correspondence and interviews with a number of Murray's friends, family members, and acquaintances, detailing his personal and family background and difficult childhood. The dates on the letters and interviews indicate that O'Neill began investigating Murray's background prior to the conclusion of the trial's guilt phase. The Memorandum also chronicled details from Murray's dysfunctional childhood, such as his suffering repeated physical abuse at the hands of his father; witnessing his father's involvement in myriad illegal activities; and records showing that he was often absent from school.

At Murray's sentencing hearing, the trial judge stated that the Memorandum and attached documents would be taken into consideration. The evidence actually presented at the sentencing hearing, though, went even further. At that time, O'Neill entered into evidence: a psychiatric evaluation of Murray, conducted by Dr. Jack Potts; and letters from and interviews with family members, friends, classmates, and co-workers on Murray's behalf. Furthermore, Brenda Murray and Ruby Bradford, Murray's mother and aunt respectively, testified in person. Although from the record it appears that Angela Hall, Murray's younger sister, was also present and ready to testify, she did not testify at Murray's sentencing hearing.

Dr. Potts' psychiatric evaluation, which was also entered into evidence at the sentencing hearing, relied upon information contained in: the pre-sentence investigation report and corresponding attachments; letters written between

the Murray brothers while incarcerated; Murray's criminal record from Alabama; interviews with Murray's family members, friends, classmates, and co-workers; police reports; and Murray's school records.  Dr. Potts was aware of Murray's medical issues, such as fecal and urinary incontinence, as well as his history of intense headaches and seizures.  Moreover, Dr. Potts' evaluation discussed the varied physical and psychological impacts of Murray's dysfunctional childhood.  Considering all of these factors, Dr. Potts concluded that Murray's circumstances warranted a mitigated sentence.

Based upon the evidence presented at both the trial and sentencing hearing, the trial judge found that the state had proven three aggravating factors beyond a reasonable doubt. Moreover, the trial judge found that Murray had proven two mitigating factors by a preponderance of the evidence: that Murray was capable of rehabilitation and that Murray suffered from a dysfunctional childhood.  The trial judge ruled that the mitigating factors were "not sufficiently substantial to outweigh the aggravating circumstances proved by the State and to call for leniency."  Murray was sentenced to death.

## B.  *Procedural History*

Murray appealed his conviction and death sentence directly to the Arizona Supreme Court.  After conducting an independent review, the Arizona Supreme Court affirmed Murray's conviction and death sentence, finding no constitutional infirmity. *State v. Murray*, 906 P.2d 542 (Ariz. 1995) (in banc).  Murray's subsequent motion for reconsideration was denied.  Likewise, Murray's petition for certiorari was denied by the United States Supreme Court.

*Murray v. Arizona*, 518 U.S. 1010 (1996). Murray then filed a petition for post-conviction relief ("PCR1") in Arizona state court. The state court denied the PCR1 and the Arizona Supreme Court summarily denied review.

In light of the Supreme Court's intervening ruling in *Ring v. Arizona*, 536 U.S. 584 (2002), Murray moved to stay the federal habeas proceedings. The district court granted a stay limited to the sentencing-related claims and directed Murray to pursue additional state post-conviction relief for his potential *Ring* claim.

After the Arizona Supreme Court denied review, the district court's stay was lifted and Murray filed a "Motion for Leave to File a Second Amended Petition for Habeas Corpus." Murray's proposed Second Amended Petition attempted to include his previously withdrawn claims, as well as one new claim, in his federal habeas petition. The district court denied Murray's motion to amend. The district court denied Murray's First Amended Petition for Writ of Habeas Corpus on the merits and declined to issue a certificate of appealability. Murray filed a timely Notice of Appeal.

## II.    STANDARD OF REVIEW

A. *Certified Claims*—Batson *and Ineffective Assistance of Counsel*

We review de novo the district court's denial of a petition for writ of habeas corpus. *Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc). However, because Murray filed his federal habeas petition on October 7, 1999, after AEDPA's effective date, we are bound by AEDPA. *See*

*Valerio v. Crawford*, 306 F.3d 742, 763 (9th Cir. 2002) (en banc) (specifying April 24, 1996 as AEDPA's effective date).

AEDPA authorizes the grant of a state prisoner's petition for a writ of habeas corpus when the relevant state-court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under AEDPA, we review the last reasoned state-court decision. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). When a state court does not explain the reason for its decision, we "look through" to the last state-court decision that provides a reasoned explanation capable of review. *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). At times, however, no state-court decision furnishes a basis for the state court's underlying reasoning. In such a circumstance, our duty under AEDPA is not absolved. *See Harrington v. Richter*, 131 S. Ct. 770, 784–85 (2011) (presuming that a state court's unexplained, summary denial of the prisoner's habeas petition constituted an adjudication on the merits); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) (applying *Richter*'s presumption to a state-court decision that addressed some, but not all, of a defendant's federal claims). "[T]he habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784. To assess whether a petitioner has met this burden, we must ask "what arguments or theories supported or . . . could have supported . . . the state court's decision," and determine "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a

prior decision of" the Supreme Court. *Id.* at 786. Thus, "'when the state court does not supply reasoning for its decision,' we are instructed to engage in an 'independent review of the record' and ascertain whether the state court's decision was 'objectively unreasonable.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)). "Crucially, this is not a de novo review of the constitutional question," *id.*, as "'even a strong case for relief does not mean the state court's contrary conclusion was unreasonable,'" *id.* (quoting *Richter*, 131 S. Ct. at 786.).

1. Contrary to, or an Unreasonable Application of Clearly Established Federal Law Under § 2254(d)(1)

Clearly established Federal law "refers to the holdings, as opposed to the dicta, of th[e Supreme] Court's decisions as of the time of the relevant state-court decision." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Obviously, a state-court decision cannot be contrary to clearly established Federal law that was not yet in existence.

Our precedent *cannot* be mistaken for clearly established Supreme Court law. *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450–51 (2013) (per curiam); *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam).

> Although an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent, it may not

> canvass circuit decisions to determine whether
> a particular rule of law is so widely accepted
> among the Federal Circuits that it would, if
> presented to this Court, be accepted as correct.

*Marshall*, 133 S. Ct. at 1450–51 (internal citations omitted). "[C]ircuit precedent may [not] be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." *Id.* at 1450. Thus, we must keep in mind that "only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied." *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

Section 2254(d)(1) provides that a state-court decision may be "contrary" to Supreme Court precedent in two circumstances. First, a state-court decision is contrary to Federal law if "the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law," or "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams*, 529 U.S. at 405. Thus, the "contrary to" prong requires a direct and irreconcilable conflict with Supreme Court precedent.

Second, § 2254(d)(1) provides that a state-court decision might offend clearly established Federal law in a manner actionable under AEDPA where the state-court decision is an unreasonable application of Supreme Court precedent. A state-court decision is an "unreasonable application" of Supreme Court precedent if "the state court identifies the

correct governing legal rule from th[e Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. It is not, however, "an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by th[e Supreme] Court." *Richter*, 131 S. Ct. at 786 (alteration omitted). Because, like state courts, we have responsibility for direct review of federal criminal appeals, we may have developed our own body of constitutional law independent of the Supreme Court. A state-court decision that we determine to be inconsistent with our cases is not necessarily "objectively unreasonable" and therefore an unreasonable application of clearly established Federal law "as determined by the Supreme Court." *Id.*; *see also Marshall v. Rodgers*, 133 S. Ct. at 1450–51 (noting the division of authority between the state court and the federal circuit court, expressing no view on the merits of the underlying claim, and reversing the grant of habeas). The deferential standard imposed under AEDPA cloaks a state court's determination with reasonableness, so long as "fairminded jurists could disagree" as to whether a claim lacks merit. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). This test is "highly deferential . . . [and] demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

It is important to note, however, that under either prong a state court's decision does not need to cite the Supreme Court's cases, "indeed, [the state court] does not even [need to be] *aware*[] of [the Supreme Court's] cases, so long as

neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam); *see also Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). Thus, so long as the state court's decision is not inconsistent with Supreme Court precedent, AEDPA bars relief under 28 U.S.C. § 2254(d)(1).

Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1). Under § 2254(d)(1), our review is "limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398. Thus, AEDPA's "backward-looking language requires an examination of the state-court decision at the time it was made. It [then logically] follows that the record under review is limited to the record in existence at that same time, *i.e.*, the record before the state court." *Id.*

2.  Unreasonable Determination of the Facts in Light of the Evidence Presented in the State Court Proceeding Under §§ 2254(d)(2) and (e)(1)

AEDPA has two provisions governing the review of a state court's determinations of fact. Section 2254(d)(2) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(e)(1), however, lends state-court determinations of fact a presumption of correctness:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Together, these two provisions govern factual challenges to a state-court conviction on collateral review. There is some confusion, however, in our cases over the interaction between these two provisions.

In *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004), we read these two provisions to apply to two different types of challenges. First, we read § 2254(d)(2) to govern habeas petitions "based entirely on the state record." *Id.* at 999. This we termed an "intrinsic" challenge to the state court's determination of fact. *Id.* at 999–1000. A successful intrinsic challenge may be based on a claim that the state-court decision is based on a "finding [that] is unsupported by sufficient evidence"; "the process employed by the state court [wa]s defective"; or "that no finding was made by the state court at all," when it was required to make a finding. *Id.* at

999. An intrinsic review requires that we "be particularly deferential to our state-court colleagues." *Id.* at 1000.

We said in *Taylor* that when we perform an intrinsic review, we may only hold that a state court's decision was based on an unreasonable determination of the facts if "we [are] convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Id.* Accordingly, we said that we may only hold that a state court's factfinding process is materially defective if we are "satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." *Id.*

Second, we read § 2254(e)(1) to apply where the habeas petitioner wishes to introduce facts outside the state court record, "*i.e.*, evidence presented for the first time in federal court." *Id.* This we termed, an "extrinsic" challenge to the state court's determination of fact. *Id.* Under this provision, if a habeas petitioner fails to raise any intrinsic challenge, or after our own intrinsic review we determine that the state court's decision was not based on an intrinsically unreasonable determination of fact, then "the state court's findings are dressed in a presumption of correctness, which then helps steel them against any challenge based on extrinsic evidence, *i.e.*, evidence presented for the first time in federal court." *Id.* Thus, we explained in *Taylor*, "the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." *Id.* Under *Taylor*, §§ 2254(d)(2) and (e)(1) are read

separately and must not be confused. *See, e.g.*, *Kesser v. Cambra*, 465 F.3d 351, 358 n.1 (9th Cir. 2006) (en banc); *Buckley v. Terhune*, 397 F.3d 1149, 1154–55 (9th Cir. 2005), *affirmed on other grounds by* 441 F.3d 688 (9th Cir. 2006) (en banc).

*Pinholster* eliminated the relevance of "extrinsic" challenges when we are reviewing state-court decisions under AEDPA, however, because it held that petitioners may introduce new evidence in federal court only for claims that we review de novo. *See Pinholster*, 131 S. Ct. at 1400–01 & nn. 7, 10; *see also Stokley v. Ryan*, 659 F.3d 802, 807–08 (9th Cir. 2011). Thus *Taylor*'s suggestion that an "extrinsic" challenge may occur "once the state court's fact-findings survive any intrinsic challenge" under § 2254(d)(2) is no longer applicable. *See Taylor*, 366 F.3d at 1000. After *Pinholster*, a federal habeas court may consider new evidence only on de novo review, subject to the limitations of § 2254(e)(2).[1] *See Stokley*, 659 F.3d at 808.

How we should now read § 2254(d)(2) and (e)(1) in context of "intrinsic" challenges to state-court factual

---

[1] If an applicant for habeas relief "has failed to develop the factual basis of a claim in State court proceedings," § 2254(e)(2) bars federal courts from holding an evidentiary hearing except in two circumstances: (1) "the claim relies on . . . a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable"; or (2) "the claim relies on . . . a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. §§ 2254(e)(2)(A)(i), (ii). If one of these circumstances is present, then the applicant must also show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id*. § 2254(e)(2)(B).

findings under AEDPA presents a more complicated question. In the years since we decided *Taylor*, both the Supreme Court and we have occasionally read §§ 2254(d)(2) and (e)(1) as though they were to be read together. That is, we have read § 2254(d)(2) to require an "unreasonable determination of fact" with § 2254(e)(1) specifying that the state court's presumption of correctness can only be overcome by clear and convincing evidence. This inconsistency is highlighted in cases, such as this one, where we have reviewed a state court's *Batson* determination using comparative juror analysis.

For example, in *Miller-El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court cited § 2254(d)(2) when stating that "Miller-El [could] obtain relief only by showing the Texas conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* at 240. In the next breath it continued, however, by citing § 2254(e)(1) for the "presum[ption that] the Texas court's factual findings [are] sound unless [the petitioner] rebuts the 'presumption of correctness by clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(e)(1)). In *Rice v. Collins*, the Court again assumed that § 2254(e)(1) qualified (d)(2). After quoting § 2254(d)(2), the Court stated that "[s]tate-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" 546 U.S. 333, 338–39 (2006) (quoting 28 U.S.C. § 2254(e)(1)); *see also Schriro v. Landrigan*, 550 U.S. 465, 473–74 (2007); *Wiggins v. Smith*, 539 U.S. 510, 528 (2003); *Miller-El v. Cockrell*, 537 U.S. 322, 341–42 (2003).

The Court agreed to address the relationship between § 2254(d)(2) and (e)(1) in *Wood v. Allen*, 558 U.S. 290 (2010). Indeed, the Court stated that it granted certiorari to resolve the question of "whether § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2)." *Id.* at 300. And the Court recognized that (d)(2) and (e)(1) address separate kinds of challenges. *Id.* at 299–300 & nn.1–2. In the end, however, the Court declined to address "any interpretive difference regarding the relationship between these provisions," and left "for another day the questions of how and when § 2254(e)(1) applies in challenges to a state court's factual determinations under § 2254(d)(2)." *Id.* at 300, 304–05.

Notwithstanding the force of *Taylor*, we too have continued to struggle with the relationship between §§ 2254(d)(2) and (e)(1) when reviewing state-court factual findings under AEDPA. In our en banc decision in *Kesser*, we criticized the dissent for ignoring *Taylor* and observed that "[b]ecause the evidence of the prosecutor's bias is found in the record that was before the California Court of Appeal, we are governed by § 2254(d)(2) rather than § 2254(e)(1)." *Kesser*, 465 F.3d at 358 n.1; *see also Lambert v. Blodgett*, 393 F.3d 943, 971–73 & n.19 (9th Cir. 2004). At the same time, we further noted, however, that "[i]n any event, the question of which AEDPA standard we apply here may be academic, because the record satisfies either standard." *Kesser*, 465 F.3d at 358 n.1. Our ultimate decision was consistent with this position. We cited § 2254(d)(2) to hold that "[o]n the basis of the record, . . . the California Court of Appeal's conclusion that the prosecutor did not strike Rindels because she was Native American [was] wrong, and unreasonably so." *Id.* at 368. We continued, however, by citing § 2254(e)(1) and stating that "we th[ought] the record

so strong on this point that it cannot admit any other conclusion, and even satisfies the more demanding standard of 'rebutting the presumption of correctness by clear and convincing evidence.'" *Id.*

Since *Kesser*, our panel decisions appear to be in a state of confusion as to whether § 2254(d)(2) or (e)(1), or both, applies to AEDPA review of state-court factual findings. *Compare, e.g.*, *Jamerson v. Runnels*, 713 F.3d 1218, 1227–36 (9th Cir. 2013) (citing only § 2254(d)(2) and finding in each relevant situation that "the state was not unreasonable in finding that the prosecutor's justification for challenging [the individual jurors] was genuine"); *Hurles v. Ryan*, 706 F.3d 1021, 1038 (9th Cir. 2013) ("[W]e cloak the state court's factual findings in a presumption of correctness. 28 U.S.C. § 2254(e)(1). However, we afford such deference only if the state court's fact-finding process survives our intrinsic review pursuant to AEDPA's 'unreasonable determination' clause."), *with, e.g.*, *Thompson v. Runnels*, 705 F.3d 1089, 1091–92 (9th Cir. 2013) ("We begin with the facts found by the California Court of Appeal, which are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1)."); *Cudjo v. Ayers*, 698 F.3d 752, 755 n.2, 762 (9th Cir. 2012) (stating that state court facts are "afforded a presumption of correctness that may be rebutted only by clear and convincing evidence"); *Briggs v. Grounds*, 682 F.3d 1165, 1171 (9th Cir. 2012) (citing § 2254(e)(1) for the proposition that "[t]he burden to disprove the factual findings rests with [the petitioner]").

We believe any tension between *Taylor* and our cases or between *Taylor* and limited statements by the Supreme Court will have to be resolved by our court en banc, or by the Supreme Court. As we will discuss, *infra*, we do not believe the difference between our two lines of cases is determinative

in this case, and thus we need not resolve the apparent conflict to decide this case. We thus will review Murray's challenges to state-court findings that are based entirely on the record for "an unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d)(2); *Kesser*, 465 F.3d at 358 n.1. We do not consider any new evidence as to claims adjudicated on the merits by the state court. *See Pinholster*, 131 S. Ct. at 1401.

B. *Uncertified Issue—Motion to Expand Certificate of Appealability*

In addition to his *Batson* and ineffective assistance of counsel claims, Murray has elected to brief an uncertified issue regarding the district court's decision to deny his "Motion for Leave to File a Second Amended Petition for Writ of Habeas Corpus." As explained below, we treat Murray's uncertified claim as a motion to expand the certificate of appealability ("COA") that we previously granted. Under Federal Rule of Appellate Procedure 22(b)(2), a notice of appeal constitutes an application for a COA. *See Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Thus, where "a motions panel grants a COA in part and denies a COA in part," "[u]ncertified issues raised and designated in [the manner prescribed by Ninth Circuit Rule 22-1] will be construed as a motion to expand the COA and will be addressed by [us] to such extent as [we] deem[] appropriate." 9th Cir. R. 22-1(d)–(e).

A COA may issue in federal habeas review of state proceedings "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Wilson v. Belleque*, 554 F.3d 816, 825–26 (9th Cir. 2009). This is not an exacting standard. *Id.*

at 826. We will "not decline the application for a COA merely because [we] believe[] the applicant will not [ultimately] demonstrate an entitlement to relief." *Miller-El*, 537 U.S. at 337. Rather, we will issue a COA "if jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Wilson*, 554 F.3d at 826.

If, however, the district court

> denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when . . . jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack*, 529 U.S. at 484 (emphasis added). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not[, however,] conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.*

If both inquiries are satisfied, we will grant a COA. *See Hoffman v. Arave*, 455 F.3d 926, 943–44 (9th Cir. 2006), *vacated in part on other grounds by Arave v. Hoffman*, 552 U.S. 117 (2008); *United States v. Martin*, 226 F.3d 1042, 1046–47 (9th Cir. 2000).

## III. DISCUSSION

### A. Batson *Claim*

Murray's primary claim is that the state court's denial of his *Batson* objection was contrary to, or involved an unreasonable application of, clearly established Federal law, or based upon an unreasonable determination of the facts. He raises two separate points. First, Murray contends that the state court's failure to engage in a comparative juror analysis alone is an unreasonable application of clearly established Federal law. Second, Murray asserts that an independent evaluation of the voir dire transcript, application of comparative juror analysis, and a consideration of the fact that the prosecutor relied on subjective factors "clearly and convincingly" refutes the prosecutor's proffered race-neutral explanations for the exercise of the peremptory challenges used to dismiss the two Hispanic potential jurors.

The exercise of peremptory challenges on the basis of potential jurors' race violates the Equal Protection Clause of the Fourteenth Amendment. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). "Racial discrimination in [the] selection of jurors harms not only the accused whose life or liberty they are summoned to try[, but also] . . . extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." *Id.* at 87. *Batson* provides a three-step inquiry to determine if a peremptory challenge was based on race:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must

offer a race-neutral basis for striking the juror
in question[; and t]hird, in light of the parties'
submissions, the trial court must determine
whether the defendant has shown purposeful
discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008).

Under the first prong, a defendant may rely upon "all
relevant circumstances" when making a prima facie showing
that a prosecutor's challenge was exercised based on race.
*Miller-El*, 545 U.S. at 240. If the defendant satisfies this
initial burden, then the burden shifts to the prosecutor.
*Batson*'s second prong requires the prosecutor to "give a clear
and reasonably specific explanation of [the prosecutor's]
legitimate reasons for exercising the challenge[]." *Batson*,
476 U.S. at 98 n.20 (internal quotation marks omitted). That
explanation need not be "persuasive, or even plausible."
*Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)
(internal quotation marks omitted). Rather, under the second
prong, "the issue is the facial validity of the prosecutor's
explanation. Unless a discriminatory intent is inherent in the
prosecutor's explanation, [we will deem] the reason offered
[to] be . . . race neutral." *Id.* Only *Batson*'s final step
requires the trial court to judge the persuasiveness of the
prosecutor's explanation to determine whether the defendant
has ultimately satisfied the burden of proving racial
discrimination in the prosecutor's exercise of peremptory
challenges. *Id.*[2]

---

[2] As the Supreme Court has stated:

It is not until the *third* step that the persuasiveness of
the justification becomes relevant—the step in which

Arguably, the third prong is the most important part of a *Batson* inquiry because it is at that step that "the court has the duty to determine if the defendant has established purposeful discrimination." *Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003) (internal quotation mark omitted). This analysis "turns largely on the court's evaluation of the prosecutor's credibility," making the trial judge's own observations critical at this juncture. *Id.* (internal quotation marks omitted). When weighing the persuasiveness of the prosecutor's explanation, however, a trial judge must be conscious that "subjective factors may play a legitimate role in the exercise of challenges, [although] reliance on such factors alone cannot overcome strong objective indicia of discrimination." *Kesser*, 465 F.3d at 359 (en banc) (quoting *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994)). A court "must evaluate the record and consider each explanation within the context of the trial as a whole because [a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts." *Id.* (internal quotation marks and citations omitted). The "totality of the relevant facts"

---

the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Purkett*, 514 U.S. at 768 (internal citations omitted).

includes "the prosecutor's statements about his jury selection strategies and his explanations (racial and nonracial) for striking minority jurors. They also include the characteristics of people he did not challenge." *Id.* at 360 (internal citation omitted). Thus, we have long held that a comparative juror analysis is an important tool at the disposal of a trial or appellate judge for evaluating the totality of the relevant facts and "exploring the possibility that facially race-neutral reasons are a pretext for discrimination." *Lewis*, 321 F.3d at 830–31.

Because Murray has asserted that both sections 2254(d)(1) and (d)(2) entitle him to federal habeas relief, we will consider each in turn.

1.  *Batson* and Section 2254(d)(1)

Murray has only challenged the state court's failure to conduct a formal comparative juror analysis under § 2254(d)(1). It is not disputed that neither the state trial court nor the appellate court undertook a *formal* comparative juror analysis. Murray argues that clearly established Federal law requires state courts to conduct a formal comparative juror analysis.

In support of his contention, Murray predominantly relies upon the Supreme Court's decision in *Miller-El v. Dretke*, where the Court relied heavily on its own thorough comparative juror analysis in granting the petitioner federal habeas relief. 545 U.S. at 240–52, 266. In *Kesser v. Cambra*, we recognized the importance of the Supreme Court's decision in *Miller-El* and held that "[t]he Court's holding means that the principles expounded in *Miller-El* were clearly established Supreme Court law for AEDPA purposes at least

by the time of the last reasoned state court decision in *Miller-El*, handed down in 1992." 465 F.3d at 360. Here, the relevant state-court decision was decided in 1995, *State v. Murray*, 906 P.2d 542 (Ariz. 1995) (in banc). Therefore, the same Supreme Court principles we declared to be clearly established in *Kesser* would be controlling here.

Under Murray's reading of *Miller-El*, a state court *must* conduct a formal comparative juror analysis when confronting a *Batson* claim. Such a legal error under § 2254(d)(1) would require us to grant a petitioner's habeas petition without even undertaking a comparative juror analysis of our own. In effect, Murray asks us to treat whether or not the trial court conducted a comprehensive, formal comparative juror analysis as a kind of structural error—a *per se* legal requirement of the Equal Protection Clause of the Fourteenth Amendment, with prejudice presumed. *Miller-El* did not establish any such principle of law. Neither *Batson* nor the Supreme Court cases following it clearly establish that trial courts must conduct a formal comparative analysis. *Batson* did not specify the *form* of the trial court's inquiry into the prosecutor's motive, only that it must "undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (internal quotation mark omitted). We think it obvious that it would be contrary to clearly established Federal law—the "sensitive inquiry"—for a trial judge to "rubberstamp" a prosecutor's proffered race-neutral explanation for exercising a disputed peremptory strike. Similarly, we might find a clear violation of *Batson* where the trial judge misstates the test or impermissibly relies on an erroneous factor. *See, e.g.*, *Turner v. Marshall*, 63 F.3d 807, 814 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999). But, beyond these

intuitive violations, *Batson* did not dictate the formal steps the trial court must take to evaluate the prosecutor's credibility, it only established that the trial court must do so.

*Batson* and the cases that follow it do not require trial courts to conduct a comparative juror analysis. Rather, what *Miller-El* established is that a comparative juror analysis is an important means for federal courts to review a trial court's ruling in a *Batson* challenge. A close look at *Miller-El* reveals that the Court conducted its own formal comparative juror analysis to make factual comparisons with the state court's factual determinations. Thus, the Court was using a formal comparative juror analysis to review the *reasonableness* of the factual determinations underlying the state court's decision. If the mere failure of the state court to conduct a formal comparative juror analysis had been contrary to the Fourteenth Amendment, the *Miller-El* Court would have simply reversed for procedural error. But it did not. The Court's approach makes sense, however, when we focus on our respective roles. We have recognized that "[w]ithout engaging in comparative juror analysis, *we* are unable to review meaningfully whether the trial court's ruling at either step one or step three of *Batson* was unreasonable in light of Supreme Court precedent." *Boyd v. Newland*, 467 F.3d 1139, 1149 (9th Cir. 2006) (emphasis added). That is, in order for *us* to discharge our responsibility under AEDPA to review a *Batson* claim under section 2254(d)(2), we often will have to conduct a formal comparative juror analysis, and our responsibility to conduct a comparative juror analysis is not contingent on whether the state court previously performed or did not perform a formal comparative juror analysis. When there has been a *Batson* challenge, trial courts are not always situated to stop the proceedings and conduct the kind of formal comparative juror

analysis the Court conducted in *Miller-El*. Often, trial courts are well-situated to decide the question without conducting a formal comparative juror analysis because the trial court has had access to the juror questionnaires and has been intimately involved in the jury selection process. The trial judge has a front-row seat in the orchestra, making it possible for the trial court to rule quickly on spontaneous *Batson* challenges. Federal appellate courts are not similarly situated. From our lofty perch in the loges, where we are separated by time and distance from the proceedings, we must conduct a more formal comparative juror analysis because it is the only means we will have for assessing the state court's factfinding.[3]

Once we conclude that the trial court has conducted an adequate inquiry under *Batson*, our review must shift from § 2254(d)(1) to a review of the reasonableness of the state court's factual determinations under § 2254(d)(2). *See*

---

[3] Some of our panel decisions may be read to suggest that a state trial court is required to perform a formal comparative juror analysis. For example, in *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008), we stated that "the trial court failed to undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available, including a comparative analysis of similarly situated jurors, as required by clearly established Supreme Court law at the time of the trial." *Id.* at 1030 (internal quotation marks omitted). We do not think *Green* so holds. As in *Miller-El*, *Green* relied on 28 U.S.C. § 2254(d)(2) and not (d)(1). *Id.* at 1033. Thus, the better reading of *Green* is that a comparative juror analysis is one of many tools available to undertake such a "sensitive inquiry." *See id.* at 1030 ("The 'circumstantial and direct evidence' needed for this inquiry *may include* a comparative analysis of the jury voir dire and the jury questionnaires of all venire members.") (emphasis added). This reading is in harmony with our recent holding in *Jamerson v. Runnels*, 713 F.3d 1218, 1224 n.1 (9th Cir. 2013); *see also Cook v. LaMarque*, 593 F.3d 810, 816 & n.2 (9th Cir. 2010).

*Jamerson*, 713 F.3d at 1225–26 (9th Cir. April 24, 2013); *Cook v. LaMarque*, 593 F.3d 810, 816 n.2 (9th Cir. 2010). Thus, so long as sufficient facts exist to show that a trial court has satisfied its duty under *Batson*'s third step, our review is limited to § 2254(d)(2).

Because Murray has only challenged the state court's determination under § 2254(d)(1) for its failure to undertake a comparative juror analysis and this claim is without merit, we next proceed to review Murray's *Batson* claim under § 2254(d)(2).

  2.  *Batson* and Section 2254(d)(2)

The Arizona Supreme Court, ruling on Murray's *Batson* claim, accepted the trial court's finding that the "prosecutor's reasons [were] race neutral" and held that the trial court did not abuse its discretion by denying Murray's *Batson* objection. *Murray*, 906 P.2d at 557–58. The Arizona Supreme Court's decision does not itself discuss the evidence—by, for example, conducting its own comparative juror analysis—it only concludes that the trial judge's determination as to potential juror Alvardo was not "wholly subjective." *Id.* Although the Arizona Supreme Court's decision is a ruling on the merits of Murray's *Batson* claim, it is not for our purposes a "reasoned decision." *Cf. Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005) (finding a state court's decision to be reasoned where it "explained in detail why review was denied and specifically examined the substance of [the individual's] claim"). That is, the decision does not provide us with an explanation for why the Arizona Supreme Court determined that there was no purposeful discrimination by the prosecutor in the exercise of the peremptory strikes against potential jurors Pethers and

Alvardo; rather, the court merely stated that it accepted the trial judge's observations and "the prosecutor's reasons as race neutral." *Murray*, 906 P.2d at 558. Because the Arizona Supreme Court's decision did not provide the reasoning underlying its decision finding that there was no purposeful discrimination under *Batson*, we must look through the Arizona Supreme Court's decision to the state trial court's decision as the reasoned decision. *See Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007) ("On habeas review, we look through unexplained state-court decisions leaving, in effect, the denial of post-conviction relief to the last reasoned state-court decision to address the claim at issue.").

At trial, Murray asserted that the prosecutor had struck the "only two Hispanic jurors which were in the pool." Murray then requested that the court order the prosecutor to respond. Subsequently, the prosecutor offered his reasons for his exercise of peremptory challenges against potential jurors Pethers and Alvardo, and the trial court credited his explanation.

With respect to potential juror Pethers, the prosecutor focused on a major drug investigation that had centered on her mother and uncle. All potential jurors were asked if they knew anyone who worked for the Mohave County Attorney's office, since that office was prosecuting the Murray brothers. The scrutiny of potential juror Pethers began when she indicated that she knew Bob Moon, who worked for the Mohave County Attorney's office, because of her mother's case. Potential juror Pethers's mother and uncle had both spent time in jail, and even though the charges against her mother had been dismissed, the prosecutor stated that he believed a deal had been negotiated in her mother's case. The prosecutor emphasized that potential juror Pethers's mother

and uncle "were heavy into drugs," "[b]oth of the people around them were suspected of being in drugs," and there was a forfeiture action proceeding against her mother.  The prosecutor stood upon these facts to support his challenge of potential juror Pethers.

As for potential juror Alvardo, the prosecutor's explanation was that he was excessively nice, to the point that he was indecisive.  The prosecutor based this explanation on his personal knowledge from having been socially acquainted with Alvardo.

After the prosecutor provided his explanations, the trial judge stated:

> Well, under *Batson*, of course, the real question is whether the State gives valid race neutral reasons for the strike, and based on the record, my own opinions about those two particular jurors, I find that the reasons given by the State are sufficient.  It's difficult to make a *Batson* case when you only have two minorities on the jury, but even with the two I am finding that the reasons are sufficient.  I don't find that there was any racial reasons for the strikes, and the reasons are consistent with my own assessments of those particular jurors.  So, the *Batson* objection is denied.

The trial court noted that only two potential jurors were involved, at the same time acknowledging that the two comprised all of "the minorities on the jury."  The trial judge found the reasons proffered by the prosecutor "sufficient" and could "[not] find that there was any racial reasons for the

strike," and that the reasons were "consistent with [his] own assessments of those particular jurors." The trial court's observations, however brief, are fully consistent with its obligations under *Batson*.

Our obligations on AEDPA review, however, cannot be based on our "own assessments of those particular jurors." Consistent with *Miller-El*, we have to conduct our own comparative juror analysis to determine whether the trial court's "own assessments" constitute an "unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

### a. Potential Juror Pethers

On their face, the prosecutor's proffered explanations for his peremptory strike of potential juror Pethers are race-neutral. The prosecutor explained that members of potential juror Pethers's family had been prosecuted by the Mohave County Attorney's office, and that her mother was still subject to a forfeiture action. Those are legitimate grounds for exercising a peremptory challenge. *See Miller-El*, 545 U.S. at 292–93 ("The very purpose of peremptory strikes is to allow parties to remove potential jurors whom they suspect, but cannot prove, may exhibit a particular bias.").

Our comparative juror analysis supports the prosecutor's explanation. Murray points to potential jurors B and E1 as similarly-situated, non-Hispanic jurors whose family members were involved in illegal activity but who were not challenged.[4] These potential jurors are not, however,

---

[4] As we previously stated in *Kesser*, when conducting a comparative juror analysis "we necessarily include information about jurors and venire members. Where these individuals' identities have not been publicly

similarly situated to potential juror Pethers. Potential juror B is white and served on the jury. At the time of jury selection, B's brother-in-law was being represented by Roger Wayne Murray's counsel because he had recently "gotten a few DUI's." B stated, however, that her brother-in-law's situation would not affect her ability to sit on the jury. As for potential juror E1, his son-in-law had been charged with a drug offense. The prosecutor requested that the court question E1 about his feelings regarding the criminal justice system before deciding whether or not to exercise a peremptory challenge. In response, E1 stated that his son-in-law's situation had not affected his thoughts about the criminal justice system. In fact, when questioned about his feelings on criminal sentencing, E1 stated that his "son-in-law was one that got off too easy."

There are similarities between these potential jurors. All three potential jurors had family members who were involved with the criminal justice system. All three claimed it would not affect their ability to sit on the jury.

The differences among the three, however, are greater than the similarities. First, the relationship between a mother and a daughter is likely to be far closer than that of a woman with her brother-in-law or a man with his son-in-law. The affinity in the family relation was much closer in potential juror Pethers's case, creating a greater risk that she might be influenced by her mother's prosecution. Second, the

_____

disseminated previously, we have chosen to preserve their privacy by withholding their names." 465 F.3d at 362 n.4. Here, we are going to refer to these individuals by the first letter of their last name. In instances where more than one juror's last name start with an identical letter, they are differentiated by a number (*e.g.*, "Juror A1" and "Juror A2").

prosecution of potential juror Pethers's mother stemmed from what the prosecutor characterized as a *major* drug investigation, including a criminal forfeiture, which is a far cry from DUIs or simple drug possession offenses. Third, potential juror Pethers had personally been in the county attorney's office with regards to the investigation at issue and her mother's prosecution. This fact, along with the prosecutor's statement that other people around potential juror Pethers's mother were suspected of involvement, suggests that the prosecutor had reason to believe that potential juror Pethers had some active interest in her mother's case. We need not strain to see the potential bias inhering in such a situation. Moreover, potential juror Pethers's mother was contemporaneously subject to criminal forfeiture proceedings that potentially had a direct economic impact on Pethers. By contrast, B's reaction illustrates her ambivalence toward her brother-in-law's legal troubles— "He's gotten a few DUI's lately." Similarly, E1's spontaneous statement that his son-in-law got off too easy would tend to allay any questions that the prosecutor might have as to bias. In sum, the prosecutor provided a persuasive, race-neutral explanation for his peremptory challenge of potential juror Pethers, and there was a reasonable basis for the state court's decision. Our comparative juror analysis shows that the state court's decision regarding potential juror Pethers was not an unreasonable determination of the facts.

b.   Potential Juror Alvardo

The prosecutor's proffered explanation for his strike of potential juror Alvardo is also race-neutral. The prosecutor's explanation was based solely on his own personal acquaintance with Alvardo. Such "subjective factors [in the prosecutor's explanation] may [only] play a legitimate role in

the exercise of [a] challenge[] . . . [where] reliance on such factors alone [is not] overcome [by] strong objective indicia of discrimination." *Kesser*, 465 F.3d at 359. Relying solely upon the prosecutor's subjective impression based upon his social interactions with potential juror Alvardo is, admittedly, a soft factor that is so subjective that it is difficult to dispute. The record also includes, however, the trial judge's personal impression of potential juror Alvardo based on his observation of potential juror Alvardo during voir dire. The trial judge's own impressions and observations are worthy of a great degree of deference and provide sufficient support for the prosecutor's otherwise unsubstantiated explanation, particularly in the absence of any contention by Murray that potential juror Alvardo was not actually indecisive.

Murray contends that both potential jurors E2 and J knew the prosecutor, and the prosecutor presumably thought they were "nice" people, just like potential juror Alvardo. It is true that the prosecutor "used to be one of [E2's] paper customers when [she and her kids] had [a] paper route." Furthermore, in the course of these interactions, E2 had spoken with the prosecutor "once in a while." Likewise, J was the prosecutor's lodge brother. E2 and J were thus acquaintances of the prosecutor just like potential juror Alvardo. The prosecutor did not rely solely on his acquaintance with Alvardo, however, but rather Alvardo's indecisive nature. There is no information in the record to suggest that either E2 or J were indecisive. Moreover, indecisiveness is a legitimate reason to exercise a peremptory challenge. *See Brown v. Lambert*, 451 F.3d 946, 958 (9th Cir. 2005), *reversed on other grounds by Uttecht v. Brown*, 551 U.S. 1 (2007) ("It was not unreasonable for the trial judge to conclude that . . . Juror Z was unfit to serve because

of his indecisiveness, suggesting his inability to properly follow the court's instructions and apply the law.").

We hold that, the state court's decision was not an unreasonable determination of the facts.

### c. Racially Stereotyped Language

In addition to his comparative juror analysis claim, Murray also makes much of the fact that the prosecutor began his explanation for his peremptory challenges by stating that he did not believe that potential juror Pethers was Hispanic. In this regard, the prosecutor stated that he could not recall if potential juror Pethers "appeared to talk Hispanic" and noted that her maiden name, Garcia, could have been Spanish, as opposed to Hispanic. Murray contends that these comments alone, much like the circumstances underlying our decision in *Kesser*, raise "questions regarding the prosecutor's racial and cultural stereotype of the Hispanic population."

The prosecutor's comments on Native Americans and others were far more troubling in *Kesser* than the prosecutor's awkward explanation here. In *Kesser*, the prosecutor "explained that the Native Americans who work for the tribe are troublesome because they are more likely to associate themselves with the culture and beliefs of the tribe instead of our laws, and are likely to be resistive and somewhat suspicious of the justice system." *Kesser*, 465 F.3d at 362 (internal quotation marks omitted). Thus, in *Kesser*, the prosecutor's comments played on Native American culture as the *precise reason* for challenging the juror. By their very nature, such comments are not race-neutral. In *Kesser*, we also noted that the prosecutor's discussion of another potential juror was relevant "because it indicates possible

racial animus and so lends support to Kesser's argument that the prosecutor employed racial stereo-types throughout the jury selection." *Id.* at 369 n.6. The prosecutor had mentioned that he "did not consider [the potential juror] to be Native American, 'but she was in fact brown skinned,'" although the prosecutor could not determine by looking at her whether "she was an [E]ast [I]ndian, a Chican[a], or a [F]ilipin[a]." *Id.* Moreover, "[a]lthough [the potential juror] did not testify about her relationship with her husband, the prosecutor was convinced that 'she was somewhat insecure and she impressed [him] as a woman who would walk two steps to the left and one to the rear.'" *Id.* We found that statement to "smack[] of racial and ethnic stereotypes of the subservient Asian woman." *Id.*

Murray's situation is quite different from *Kesser*. Here, the prosecutor's statements do not fairly appear to be connected with the subsequent proffered race-neutral explanation. Rather, on reflection, the prosecutor's statement may appear clumsy and politically incorrect, but the comments fairly appear to be made to challenge the facts proffered by Murray to establish his prima facie case of purposeful discrimination. That is, the prosecutor was merely attempting to question whether both jurors were actually Hispanic; if they were not, then Murray would have failed to establish his prima facie case. We cannot say that these statements alone prove that a racial motivation was underlying the prosecutor's exercise of his peremptory challenges.

We affirm the district court's denial of Murray's *Batson* claim.

B. *Ineffective Assistance of Counsel Claim*

The Superior Court of the State of Arizona for the County of Mohave issued the only state-court decision regarding Murray's ineffective assistance of counsel claim, so it is the only state-court decision that we can review. The decision, however, merely concluded that Murray "fail[ed] to raise a colorable issue of ineffective assistance of counsel" for trial counsel's alleged "[f]ailure to properly prepare for the aggravation/mitigation hearing on the death penalty."

Murray argues that the state court's denial of his ineffective assistance of counsel claim violates § 2254(d)(1) as contrary to, or an unreasonable application of, clearly established Federal law, and § 2254(d)(2) as being based on an unreasonable determination of the facts. Murray contends that O'Neill "failed to investigate and present readily-available mitigation evidence to the sentencing court . . . provid[ing] a[n] [in]complete picture of Murray's troubled childhood and impairments." Murray asserts that O'Neill did not begin preparations for the sentencing phase until after the guilt phase had concluded and that those preparations did not include: obtaining a complete set of his school, employment, medical, prison, and probation records; and interviewing members of his immediate family or his closest childhood friends. Finally, Murray argues that O'Neill failed to provide Dr. Potts with sufficient background information and that O'Neill should have hired additional mental health experts "to evaluate Murray and testify about his organic brain damage and other neuropsychological problems."

1.  *Strickland* Standard

The Sixth Amendment right to effective assistance of counsel, applicable to the states through the Due Process Clause of the Fourteenth Amendment, applies through the sentencing phase of a trial. U.S. Const. amend. VI; U.S. Const. amend. XIV, § 1; *Gideon v. Wainwright*, 372 U.S. 335, 343–45 (1963); *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002). The Supreme Court explained the legal standard for assessing a claim of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668, 685–87 (1984). *Strickland* contains two prongs:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

*Strickland*'s first prong requires that "the defendant . . . show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "[T]he relevant

inquiry . . . is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). This inquiry is "highly deferential" to begin with, *Strickland*, 466 U.S. at 689, and "doubly deferential" when *Strickland* and AEDPA "operate in tandem." *Walker*, 709 F.3d at 941 (citing *Richter*, 131 S. Ct. at 788) (internal quotation marks omitted).

Counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court clarified that the relevant inquiry "is not whether counsel should have presented a mitigation case," but rather, "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [a defendant's] background *was itself reasonable*." *Id.* at 523. The Supreme Court stated that "[i]n assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Id.* (internal citation omitted). That is, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions." *Pinholster*, 131 S. Ct. at 1406. We must therefore begin any ineffective assistance of counsel inquiry "with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy.'" *Id.* at 1404 (quoting *Strickland*, 466 U.S. at 689).

*Strickland*'s second prong requires that "[t]he defendant . . . show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Here, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695; *see also Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (examining *Strickland*'s prejudice prong *de novo*, where the state courts had never reached the issue of prejudice).

2.   Application of 28 U.S.C. § 2254(d)

Murray claims that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" under § 2254(d)(1). He also argues that the state court's rejection of his claim was "based on an unreasonable determination of the facts" under § 2254(d)(2). As above, because there is no reasoned state-court decision, we must undertake an independent review of the record to determine if any reasonable basis supports the state court's decision. *See Walker*, 709 F.3d at 939.

Here, Murray has attempted to supplement the state-court record with extrinsic evidence—affidavits, including declarations by friends and family members, and expert opinions relating to Murray's psychiatric evaluation by Dr. Potts. None of these materials were brought to the attention of the state courts, but were first introduced before the district court.

The only evidence submitted before the state court with respect to Murray's ineffective assistance of counsel claim was testimony elicited from O'Neill during a state-court evidentiary hearing. That evidence was focused, however, on O'Neill's failure to call a Mr. Anthony as a witness, although some general information was presented about O'Neill's overall lack of experience in handling serious felony and death penalty cases. No evidence was presented before the state court regarding O'Neill's alleged failure to "contact Murray's closest childhood friends . . . and his two sisters," hire an investigator experienced in mitigation investigation, or hire additional mental health experts. Because, as Murray concedes, the state court decided this claim on the merits, we may only consider the evidence that was before the state court in our AEDPA review.[5] *See Pinholster*, 131 S. Ct. at 1398. Furthermore, our review is limited to whether "we [are] convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the [state court's] finding[s] [are] supported by the record." *Taylor*, 366 F.3d at 1000.

Our independent review of the state-court record reveals the following. As part of Murray's pre-sentence memorandum, O'Neill appended a number of letters and taped interviews with friends, family, co-workers, and other acquaintances. These communications reveal that O'Neill began investigating Murray's background and preparing for the sentencing hearing long before the guilt phase was concluded. Further, it appears that O'Neill traveled from Arizona to Alabama and personally interviewed individuals

---

[5] Although Murray has previously made claims of ineffective assistance of appellate counsel, those claims have all been denied and are not before us.

acquainted with Murray. We find that Murray's contention that O'Neill failed to begin preparations for the penalty phase prior to the conclusion of the guilt phase is unfounded.

With respect to the thoroughness of counsel's investigation, a look at O'Neill's pre-sentence memorandum reveals that she and her investigator had contacted and interviewed the following individuals, at least once: Joyce Michael (ex-wife), Ruby Bradford (aunt), Hulon Murray (uncle), Pete Hardee (friend and former co-worker), Tom Hallman (ex-employer and family friend), Doug Price (former classmate and friend), and David Lovelace (friend). These individuals provided a wealth of information regarding Murray's background. Counsel elicited information regarding Murray's urinary and fecal incontinence and the corresponding effects those difficulties had on him as a child, Murray's physically and verbally abusive childhood, Murray's failure in school, and Murray's exposure to weapons.

At Murray's sentencing hearing, in addition to the pre-sentence investigation and memorandum, O'Neill submitted into evidence a number of letters written on Murray's behalf. The letters were written by: Justin Murray (son), Joyce Murray (ex-wife), Brenda Murray (mother), Kenneth Murray (father), Shonna Alexander (sister), Angela Hall (sister), Keith Alexander (brother-in-law), Dolphus Bradford (uncle), Karrie Murray, Leslie O'Dell, Barbara O'Dell, and Tom and Ann Morgan.

Not all of this information, however, was introduced through live testimony at the sentencing hearing. O'Neill advised the trial court that

> the people that know my client, Robert
> Murray, and have known him all of his life,
> don't live in Arizona, they live 2,000 miles
> away or so in Alabama. A few of those
> people are going to be able to come out and
> testify. Most of them cannot for various
> reasons.

A wealth of information was provided to the court in the best possible way O'Neill could present it in light of geographical and other constraints.

O'Neill did have three witnesses available to testify: Brenda Murray (mother), Angela Hall (sister), and Ruby Bradford (aunt). Brenda Murray testified about how Murray's father had physically abused him with his fists, at least a dozen times. She further detailed Murray dropping out of high school; working in his father's bookie and night club operations; being worked excessively by his father, even with a broken collarbone; and being forced into a marriage at a young age. Murray's aunt, Ruby Bradford, testified regarding Murray's childhood urinary and fecal incontinence and Murray's father's failure to have him examined by a doctor even though encouraged to do so by Murray's grandmother. Ruby Bradford also testified that Murray was a withdrawn child. Although Murray's sister, Angela Hall, was present and prepared to testify, counsel did not call her. Nothing in the record suggests that she could have presented information that was not already before the court or that might have affected the results.

Murray's claims that O'Neill neglected to interview his immediate family members and closest friends and only presented bits and pieces of the complete picture of his life

and impairments are unsupported by the evidence in the record.  No attorney can present a complete picture of his client's life.  In this case, however, O'Neill provided the state court with sufficient evidence to paint a vivid picture of Murray's life.  Murray cannot point to a single, material piece of evidence that would have been determinative at sentencing.  Thus, we find that O'Neill's performance, in this regard, did not fall below an objective standard of reasonableness under *Strickland*, much less that the state court's decision was an unreasonable application of *Strickland*.

Murray further contends that O'Neill failed to obtain a complete set of Murray's school, employment, medical, prison, and probation records.  In particular, Murray argues that O'Neill did not provide sufficient background information to Dr. Potts and that additional experts should have been hired to testify regarding organic brain damage.  Again, however, the record belies this contention.  O'Neill's pre-sentence report contained a set of Murray's prison records from Alabama.   The pre-sentence investigation report included Murray's prior criminal record.   Likewise, the information presented to Dr. Potts for use in conducting his mental evaluation included Murray's criminal, prison, and school records.   Furthermore, it appears that Dr. Potts personally interviewed Murray regarding his medical history, including previous difficulties with intense headaches and seizures; conducted interviews with numerous individuals who knew Murray; and had access to information relating to the crime.  The record does not support a finding that O'Neill did not provide Dr. Potts with sufficient background information.  Furthermore, O'Neill had no information that would have made resort to an additional expert necessary.  Dr. Potts was aware of Murray's previous headaches and

seizures and did not find them to be consequential, so there was no reason for O'Neill to inquire further.

In sum, we find that the record does not support a finding that the state court's decision regarding the adequacy of O'Neill's performance in conducting the mitigation investigation was based on an unreasonable determination of the facts or an unreasonable application of *Strickland*. Murray can point to no evidence that would suggest that the state court's decision was based on an unreasonable determination of fact. The record shows that O'Neill pursued diligently a number of avenues for obtaining background evidence relevant to the mitigating factors that could assist in Murray's sentencing hearing. We affirm the district court's denial of Murray's ineffective assistance of counsel claim.

C. *Uncertified Issue—District Court's Denial of Murray's "Motion for Leave to File a Second Amended Motion for Writ of Habeas Corpus"*

In addition to his *Batson* and ineffective assistance of counsel claims, Murray has elected to brief an uncertified issue, arguing that the district court abused its discretion by denying his "Motion for Leave to File a Second Amended Petition for Writ of Habeas Corpus." That motion contained sixteen claims—fifteen claims that had previously been withdrawn and one additional new claim.[6] The district court denied Murray's motion to amend because it found the proposed claims to be duplicative, frivolous, and futile, and

---

[6] The sixteen claims are numbers 6, 20–21, 23–27, 38, 41–46, and 48 in Murray's proposed Second Amended Petition for a Writ of Habeas Corpus.

determined that allowing the amendment would unduly delay the proceedings and prejudice the respondents.

Murray contends that the state court's failure to designate with sufficient clarity why it did not decide Murray's claims on the merits makes federal review appropriate, and that his claims are not futile. Furthermore, Murray argues that the previous withdrawal of his claims from his federal habeas petition to pursue post-conviction relief in state court did not unduly delay the presentation of his claims to the district court, particularly because the parties were the same in both state and federal court and his withdrawal of claims was not done in an effort to avoid procedural requirements.

We decline to grant Murray's motion to expand the COA because he has failed to make a substantial showing of the denial of a constitutional right. The district court found that the majority of Murray's proposed claims would be futile. A determination of futility contemplates whether, upon de novo review, the amendment could present a viable claim on the merits for which relief could be granted. *See Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 893 (9th Cir. 2010) ("When the district court denies leave to amend because of futility of amendment, we will uphold such denial if 'it is clear, upon *de novo* review, that the complaint would not be saved by any amendment.'" (quoting *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008)); *Serra v. Lappin*, 600 F.3d 1191, 1200 (9th Cir. 2010); *see also Caswell v. Calderon*, 363 F.3d 832, 838–39 (9th Cir. 2004). Furthermore, "proposed amendments [are futile when they] are either duplicative of existing claims or patently frivolous." *Bonin v. Calderon*, 59 F.3d 815, 846 (9th Cir. 1995). Thus, jurists of reason would not find debatable that

a futile claim cannot be the basis for a substantial showing of the denial of a constitutional right.

Murray argues that the district court erred in determining that it would have been futile for him to amend his habeas petition. Murray contends that federal review is not barred by procedural default because there is no unambiguous independent and adequate state ground. Specifically, Murray asserts that the state court's decision was ambiguous because "it referenced more than one state procedural rule in connection with more than one claim."

The doctrine of procedural default provides that "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." *Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012). This doctrine is grounded in federalism, because federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 726–29 (1991). On the other hand, "if the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition." *Id.* at 735; *see also Belmontes v. Ayers*, 529 F.3d 834, 856 (9th Cir. 2008), *rev'd on other grounds by Wong v. Belmontes*, 558 U.S. 15 (2009).

1.  Claims 6, 21, 23–27, and 42–46

Murray's proposed claims 6, 21, 23–27, and 42–46 were presented in a petition for post-conviction relief filed in Arizona state court.  Each of those claims was denied by the state court as "precluded under Rule 32.2 of the Arizona Rules of Criminal Procedure."  Rule 32.2 provides in relevant part:

> a. Preclusion. A defendant shall be precluded from relief under this rule based upon any ground:
>
>> (1) Raisable on direct appeal under Rule 31 or on post-trial motion under Rule 24;
>>
>> (2) Finally adjudicated on the merits on appeal or in any previous collateral proceeding;
>>
>> (3) That has been waived at trial, on appeal, or in any previous collateral proceeding.

Ariz. R. Crim. P. 32.2(a).  We have explained that

> [a] claim that has been found to be 'precluded' under subsection (a)(2) appears to be a classic exhausted claim and may therefore be subject to consideration in federal habeas. . . . In contrast, a claim that has been 'waived' under subsection (a)(3) is procedurally defaulted and therefore barred from federal court consideration, absent a

showing of cause and prejudice or fundamental miscarriage of justice.

*Poland v. Stewart*, 169 F.3d 573, 578 (9th Cir. 1999). Similarly, the Supreme Court has recognized Arizona Rule of Criminal Procedure 32.2(a)(3) as an independent and adequate state ground that bars federal habeas review of constitutional claims. *Stewart v. Smith*, 536 U.S. 856, 861 (2002). For such a state procedural rule to constitute an adequate state ground, however, the rule must be "firmly established and consistently followed." *Martinez*, 132 S. Ct. at 1316; *Johnson v. Mississippi*, 486 U.S. 578, 587–89 (1988). We have determined that Arizona Rule of Criminal Procedure 32.2(a)(3) has been firmly established and consistently followed, and Murray has not pointed to any decisions "demonstrat[ing] that Arizona has become inconsistent and irregular in its reliance on [that rule]." *Ortiz v. Stewart*, 149 F.3d 923, 931–32 (9th Cir. 1998). Accordingly, Murray's claims have been procedurally defaulted and allowing him to amend his federal habeas petition would be futile, regardless of any potential constitutional merit inhering in the underlying claims. 28 U.S.C. § 2254(b)(1)(A).

Here, Murray's lone argument is that the state court's ruling was ambiguous and therefore an unambiguous, independent, and adequate state ground does not bar habeas review. The state court decision dismissing Murray's claims in his second petition for post-conviction relief stated that the issues were "precluded under Rule 32.2 of the Arizona Rules of Criminal Procedure." Murray argues that the state court decision was ambiguous because it failed to specify which subsection of Rule 32.2 the decision relied upon and reliance upon Rule 32.2(a)(2) would be properly before the district

court as an exhausted claim. Murray is correct that the state court did not specify which subsection of Rule 32.2 it was relying on, but we do not think that ends the discussion. The question becomes whether other information can be consulted to determine if the state court clearly relied upon Rule 32.2(a)(3).

In *Coleman*, the Court observed that the Virginia Supreme Court had granted a motion to dismiss the petition for appeal without stating its reasons. 501 U.S. at 740. There, the Court looked beyond the order granting the motion to dismiss and found that the "motion was based solely on Coleman's failure to meet the [Virginia] Supreme Court's time requirements." *Id.* The Court relied on the fact that the underlying motion only discussed state-law time requirements and concluded that it constituted an independent and adequate state ground. *Id.*; *see also Poland*, 169 F.3d at 578–79 (examining prior proceedings to determine whether the claims were procedurally precluded). However, we have said that where underlying arguments present mixed arguments of preclusion and waiver there is no "clear[] and express[]" state bar to federal review. *Valerio v. Crawford*, 306 F.3d 742, 774–75 (9th Cir. 2002); *Lambright v. Stewart*, 241 F.3d 1201, 1205–06 (9th Cir. 2001) (citing *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996)).

As in *Coleman* and *Poland*, the district court looked to the petition for post-conviction relief underlying the state court's ruling. Here is the district court's finding:

> [A] review of [Murray's] Rule 32 petition reveals that, in arguing against summary dismissal, he only addressed the reasons the Withdrawn Claims had not been presented in

his initial Rule 32 proceeding, *i.e.*, why the claims were not precluded as waived under subsection (a)(3).  He did not argue in state court, nor does he argue in this Court, that the claims had been previously adjudicated.  This Court concludes that the state court's intent regarding preclusion is plain, unambiguous and necessarily rested on subsection (a)(3).

We have reviewed Murray's petition and agree with the district court.  In his petition, Murray exclusively argued why Rule 32.2(a)(3) did not preclude Arizona courts from reviewing his claims.  Indeed, Murray has not argued before the state court, district court, or us that his claims had previously been adjudicated.  Thus, it does not "fairly appear" that the state court relied upon Rule 32.2(a)(2).  As such, Murray's claims are procedurally defaulted—and amendment is futile—unless he can "show[] cause for the default and prejudice from a violation of federal law." *Martinez*, 132 S. Ct. at 1316.  Murray has not, however, attempted to show cause and prejudice, even though he was given the opportunity to do so by the district court.  Since Murray has not shown cause and prejudice, proposed claims 6, 21, 23–27, and 42–46 are procedurally defaulted and amendment would be futile.  We therefore agree with the district court that reasonable jurists would not find it debatable that these proposed claims do not set forth a substantial showing of the denial of a constitutional right.  We decline to expand the COA with respect to these claims.

2.  Claims 38 and 41

Murray's proposed claim 38 was also presented in a petition for post-conviction relief that was filed in Arizona

state court. Proposed claim 38 was also denied by the state court as "precluded under Rule 32.2 of the Arizona Rules of Criminal Procedure." As such, Murray's proposed claim 38 is procedurally defaulted for the same reason as claims 6, 21, 23–27, and 42–46 above.

Likewise, Murray's proposed claim 41 is also procedurally defaulted. Murray failed to present proposed claim 41 to the state court and, like the claims discussed above, it is barred by Arizona Rule of Criminal Procedure 32.2(a)(3). A claim is still barred by procedural default if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1.

Since both claims 38 and 41 have been procedurally defaulted, Murray can raise these claims on habeas review only if he can show cause and prejudice. *See Martinez*, 132 S. Ct. at 1316. With respect to these two claims, which allege ineffective assistance of trial counsel, Murray has raised a *Martinez* claim that could potentially satisfy the requisite cause and prejudice. In *Martinez*, the Supreme Court stated that "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a *substantial claim of ineffective assistance at trial* if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." 132 S. Ct. at 1320 (emphasis added). As in *Martinez*, Murray alleges that he could not have brought his ineffective assistance of trial counsel claims—claims 38 and 41—in his initial petition for state post-conviction relief. Murray asks that this case be

remanded to for the district court to determine whether he can establish cause and prejudice to overcome his procedural default.

*Martinez* cannot establish cause for Murray because he cannot show a "substantial claim" of ineffective assistance of trial counsel. *Sexton v. Cozner*, 679 F.3d 1150, 1157–58 (9th Cir. 2012). Murray's proposed claim 38 is based upon O'Neill's alleged failure to secure experts to discredit the State's witnesses at trial. As we stated above, under *Strickland*, to establish an ineffective assistance of counsel claim Murray must show (1) deficient performance and (2) prejudice. *Strickland*, 466 U.S. at 687. Murray alleges that a number of experts could have potentially discredited various of the state's witnesses: O'Neill relied on Roger Wayne Murray's expert witness who the jurors laughed at during his cross-examination; O'Neill did not call an expert to testify as to the proper methodology of collecting evidence; O'Neill did not retain a doctor to testify about Murray's pre-existing ankle injury that may have discredited the State's footprint evidence; O'Neill did not retain an expert to determine the identification of the unidentified fingerprints that were found at the crime scene; O'Neill did not retain an expert to determine the identification of the unidentified fingerprints on the weapons used in the shooting; O'Neill did not retain a DNA expert to analyze the blood at the scene; and O'Neill did not retain a blood splatter expert to explain how the victims' blood may have gotten on Murray's clothes.

Initially, we note that many of these decisions are likely to have been strategic in nature, requiring us to provide trial counsel with great deference. *Strickland*, 466 U.S. at 690. Regardless, Murray cannot establish prejudice. As we have recounted in the facts, the evidence against Murray was

overwhelming. The evidence presented by the State at trial showed that the spent twelve-gauge shotgun shells found in Murray's pants' pocket and at the crime scene were fired by the twelve-gauge shotgun recovered from the vehicle Murray was driving. Each of the victims had suffered a shotgun blast to the head; the blood on Murray's shirt could have only come from the victims. Further, Murray was found with the victim's couch cushion which contained rolled coins stamped "Dean Enterprises, Grasshopper Junction, Kingman, Arizona, 86401" and a scanner and knob from the Grasshopper Junction tow truck. Ignoring the mountain of other evidence directly and indirectly pointing to Murray's guilt, this evidence alone is more than sufficient to implicate Murray in the murders. Thus, even if O'Neill had offered the experts Murray claims should have been presented, the evidence was so overwhelming that it would have had no effect on the jury's verdict. As such, Murray cannot show that his potential *Martinez* claim is underpinned by a substantial ineffective assistance of trial counsel claim, since that claim is wholly without merit.

Murray's proposed ineffective assistance of trial counsel claim 41 is also based upon O'Neill's alleged ineffectiveness for failing to question the trial court judge about his views on the death penalty. Murray has offered nothing to suggest that the trial court judge possessed any bias regarding the death penalty.

Because Murray cannot rely upon *Martinez* to supply the cause and prejudice for his procedural default of proposed claims 38 and 41, these claims are also futile. We therefore agree with the district court, and conclude that reasonable jurists would not find it debatable that these proposed claims fail to set forth a substantial showing of the denial of a

constitutional right. We decline to expand the COA with respect to these claims.

### 3. Claims 20 and 48

The district court also denied Murray leave to amend his petition to include his proposed claim 20 based on *Ring v. Arizona*, 536 U.S. 584 (2002). Relying on *Schriro v. Summerlin*, 542 U.S. 348 (2004), the district court found this claim to be futile since Murray's direct appeal was final prior to the Court's decision in *Ring*. *See id.* at 358 (holding that *Ring* "does not apply retroactively to cases already final on direct appeal"). Because the district court was clearly correct, proposed claim 20 is futile.

Finally, Murray's proposed claim 48 is futile as duplicative of claims already presented in his habeas petition—claims 8, 13, 15–19, and 28. *See Bonin v. Calderon*, 59 F.3d 815, 846 (9th Cir. 1995). Thus, none of the additional claims Murray desires to include in his proposed Second Amended Petition could present a viable claim on the merits for which relief could be granted. *See Carvalho*, 629 F.3d at 892–93.

Because jurists of reason would not find debatable that Murray has failed to set forth a substantial showing of the denial of a constitutional right, we deny his motion to expand the COA.

### IV.    CONCLUSION

For the foregoing reasons, the district court properly denied Murray's petition for the writ of habeas corpus. The judgment of the district court is **AFFIRMED**.